Revised January 7, 1999

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 96-20873

_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,


VERSUS


WILLIE BURNS; MARTANETTE ALEXANDER;
GREGORY EUGENE AUGUST; EARLINE MONTGOMERY,

                                        Defendants-Appellants.

*******************************************************


_____

No. 97-20288

_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,


VERSUS


GREGORY EUGENE AUGUST,

                                        Defendant-Appellant.


_____

December 9, 1998

Before KING, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

In this appeal we are asked to review the convictions of four appellants who were found guilty of defrauding the Resolution Trust Company ("RTC") and the Federal Deposit Insurance Company ("FDIC"). Two of those appellants also ask us to review the propriety of their sentences. For the following reasons we affirm the appellants' convictions and sentences.

I.

Appellant Gregory August ("August") was the owner and chief executive officer of the August Group Incorporated ("TAGI"), a privately held property-management company based in Texas. Appellant Earline Montgomery ("Montgomery") was TAGI's acting vice-president and secretary. Appellant Martanette Alexander ("Alexander") was August's former girlfriend, but was not formally employed by TAGI. Appellant Willie Burns ("Burns") was a friend of August and, like Alexander, not formally employed by TAGI. Ephraim Tennie ("Tennie"), a government witness who testified for the government at the appellants' trial, worked for TAGI as a maintenance coordinator.

In 1991 and 1992, TAGI entered four separate contracts to

2

manage various properties that were in receivership of the RTC. TAGI entered those agreements with companies that were under contract with the RTC under "Standard Asset Management and Disposition Agreements" ("SAMDA"). Those companies, which we will refer to as SAMDA contractors, were engaged by the RTC to perform asset management and disposition services in connection with various loan assets, real estate assets, and other assets held by the RTC. In general, a SAMDA contractor's duties were to restore, maintain, market, and sell the RTC properties in accordance with federal policies and procedures. The SAMDA contractors also were authorized to select and hire property management companies, like TAGI, to carry out day-to-day management functions. The property management companies, in turn, were authorized to subcontract with other vendors to provide basic services for the properties; security, trash removal, lawn maintenance, and so on. The subcontractors' invoices were submitted for payment to the property management companies, or to the SAMDA contractors, depending on the particular arrangement in place. The SAMDA contractors paid the property-management fees, expenses, and reimbursables with money funded by the RTC.

TAGI entered four contracts with the following SAMDA contractors to manage the following RTC properties: (1) Benjamin Franklin Federal Savings Association ("BFFSA") to manage the Green Oaks Apartments in Laporte, Texas; (2) the J.E. Robert Company ("JER") to manage the Richwood Place Apartments in Houston, Texas;

3

(3) ONTRA, Inc. ("ONTRA") to manage roughly 500 properties in Texas and Oklahoma; and (4) National Loan/CRT Joint Venture ("NL/CRT") to manage the Spring Cypress Shopping Center in Houston, Texas. In accordance with the terms of those contracts, TAGI was barred from hiring related companies to perform services at the properties without acquiring RTC approval.[1] Additionally, TAGI was limited to the monetary compensation specifically provided under the contracts; it was forbidden from realizing additional outside profits from its management of the properties.

TAGI entered into a similar management contract with the FDIC in 1992.[2] Under that agreement, TAGI promised to provide property management services for Cavender's Boot City ("Cavender's") in Houston, Texas, which was in receivership of the FDIC. That contract, like TAGI's property management contracts for the RTC properties, contained a conflict of interest provision that prohibited TAGI from transacting business with a related company.

Over the next several years TAGI hired more than a dozen subcontractors to perform various functions at its contracted

---

[1] There is no uniform provision or definition in the four contracts relating to this requirement; each expresses the prohibition differently. A common theme in the four contracts, however, is that TAGI was precluded from hiring a company with which TAGI would have a conflict of interest. In this appeal the appellants do not dispute whether TAGI violated this prohibition. Accordingly, for purposes of this appeal we assume that TAGI in fact violated those conflict of interest provisions.

[2] Unlike the contracts relating to the RTC properties, TAGI's contract with the FDIC did not involve a SAMDA contractor. It was entered directly with the FDIC.

4

properties. Unbeknownst to the RTC, FDIC, and SAMDA contractors, however, many of those companies were affiliated with August and TAGI. For example, Guardco Security Company ("Guardco"), Evergreen Lawn Care, and Alexander Plumbing Company, were started by Alexander, who filed assumed name certificates and opened new bank accounts for the three companies. CQ&S Enterprise Company ("CQ&S") operated with a bank account that August had opened with TAGI's address and an assumed name certificate filed years earlier by Charles Newton, August's deceased lodge brother. Capital City Contractors ("Capital Contractors"), Capital City Management ("Capital Management"), and Pro-Lawn Service ("Pro-Lawn"), operated under assumed name certificates filed by Nathaniel Gordon ("Gordon"), a TAGI employee who also assisted in the management of those companies.

The appellants never advised the RTC, FDIC, or SAMDA contractors that TAGI had hired related companies to perform services on the contracted properties. When federal authorities finally grew suspicious, and searched TAGI's offices in May 1993, they found blank invoices of various TAGI-affiliated companies, checkbooks of these companies, and blank insurance certificates. The next day, August, Montgomery, Burns, Tennie, and Gordon met at Club Reflections, a bar owned by August, where they sorted through a box of incriminating documents that had escaped detection. They then burned those documents in an alley outside the club.

On November 2, 1994, the appellants were charged in a multi-

count indictment charging them with conspiracy to defraud the United States in violation of 18 U.S.C. § 371, in combination with other fraud-related offenses. The appellants were then jointly tried to a jury on November 17, 1995. Over the course of that trial, which lasted for nearly three months, the government came forward with a mountain of evidence demonstrating that for roughly two and a half years the appellants conspired to bilk the government. False invoices were generated for work that was never done. Valid invoices from legitimate vendors were altered, falsified, and inflated to show greater amounts of monies owed. False bids were submitted to boost claimed reimbursables.

Evidence also showed that the appellants took active measures to conceal their fraud. August, for example, terminated the services of "Guardco, Inc." a properly licensed company that had been providing security services for the Green Oaks Apartments, and surreptitiously replaced it with the Guardco that Alexander had created. Montgomery instructed Tennie on numerous occasions to generate fake invoices and alter valid ones. Alexander, who was employed at an unrelated bank, assisted in hiding August's involvement by filing assumed name certificates, and establishing bank accounts, for several of the related companies. Burns, on August's instructions, would negotiate and sign contracts as the sole proprietor of CQ&S, even though August was the actual owner.

On February 16, 1996, a jury convicted August of one count of conspiracy (Count 1), four counts of illegal participation (Counts

2 - 5), 18 U.S.C. § 1006(2); seven counts of making false claims to the RTC (Counts 6 - 11 & 13), 18 U.S.C. § 287; four counts of making false statements to FDIC (Counts 14 - 17), 18 U.S.C. § 1007; and one count of money laundering (Count 20), 18 U.S.C. § 1956(a)(1)(B)(i). August subsequently was sentenced to 96 months imprisonment.

Montgomery was found guilty of one count of conspiracy (Count 1), four counts of illegal participation (Counts 2 - 5), 18 U.S.C. § 1006(2); seven counts of making false claims to the RTC (Counts 6 - 11 & 13), 18 U.S.C. § 287; and four counts of making false statements to FDIC (Counts 14 - 17). She received a sentence of 37 months imprisonment.

Alexander was convicted of one count of conspiracy (Count 1), and two counts of illegal participation (Counts 2, 3 & 5), 18 U.S.C. § 1006(2). The court sentenced Alexander to 15 months imprisonment.

Burns was found guilty on one count of conspiracy (Count 1), and one count of illegal participation (Count 4), 18 U.S.C. § 1006(2). He was ordered to serve a 24-month term of imprisonment. Each of the appellants now appeal their respective convictions. Montgomery and Burns also challenge their sentences.

II.

On appeal August challenges the sufficiency of the evidence supporting his convictions under Count 20 for money laundering, 18

7

U.S.C. § 1956(a)(1)(B)(i), and aiding and abetting in the commission of that crime, 18 U.S.C. § 2. He does not dispute the evidentiary basis for any of his other convictions. August moved for judgment of acquittal at the close of the government's case, and at the end of trial, thus preserving his sufficiency claim for appellate review. *United States v. Pankhurst*, 118 F.3d 345, 351 (5th Cir.), *cert. denied*, 118 S. Ct. 630 (1997). The district court denied those motions.

We review *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Myers*, 104 F.3d 76, 78 (5th Cir.), *cert. denied*, 117 S. Ct. 1709 (1997). In evaluating the sufficiency of the evidence we must affirm the verdict "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Id.*

To prove the offense of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, and (3) which the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity. 18 U.S.C. § 1956(a)(1)

8

(B)(i); *United States v. West*, 22 F.3d 586, 590-91 (5th Cir.), *cert. denied*, 513 U.S. 1020 (1994).

In this case, August's money laundering conviction was based on the following series of financial transactions. JER, a SAMDA contractor for the RTC, issued a $56,250 check to CQ&S, a subcontractor who was ostensibly hired by TAGI to perform repair work at the Richwood Place Apartments. When JER issued the check to CQ&S it was unaware that the company was in fact controlled and operated by August. That fact was kept hidden from JER through the efforts of Burns who, on August's instructions, went to the offices of JER and posed as CQ&S's president.

After Burns personally accepted the check from JER, he deposited it in CQ&S's bank account. August, the only signer on the CQ&S account, then wrote a check drawn on the account for $25,000, which he deposited in TAGI's bank account.[3] The government alleged at trial that August structured those transactions in an effort to conceal the fact that he was illegally participating in the financial dealings between JER and CQ&S.

In challenging the evidentiary basis of his money laundering conviction, August does not dispute the first two elements of the offense. He concentrates instead on the third required element of

---

[3] The parties do not dispute that the $25,000 that was transferred from the CQ&S bank account to the TAGI account was a portion of the $56,250 in proceeds paid by JER to CQ&S for the repair work.

money laundering, the design requirement.  August contends that a reasonable jury could not conclude that the $25,000 check-transfer was designed to conceal the fraudulent nature of those funds because his name and address were plainly listed on both the CQ&S account and the TAGI account, making his identity readily apparent. We are unpersuaded.

In arguing that the design requirement is missing in this case, August focuses exclusively on the $25,000 transfer, to the complete exclusion of the events that preceded that transaction. He is assuming, we think, that those events are not relevant in determining whether he intended to conceal the illegal proceeds. That assumption is mistaken.

Many financial transactions have the effect of concealing illegal proceeds by converting them into a more legitimate form, and by adding one more degree of separation between the illegal proceeds and the original unlawful activity.  *See **United States v. Willey***, 57 F.3d 1374, 1384 (5th Cir.) (observing that the design requirement distinguishes the crime of money laundering from the innocent act of mere money spending), *cert. denied*, 516 U.S. 1029 (1995).  For that reason this Court has explained that "merely engaging in a transaction with money whose nature has been concealed through other means is not itself a crime."  ***United States v. Garcia-Emanuel***, 14 F.3d 1469, 1474 (5th Cir. 1994). "[T]he government must prove that the specific transactions in

10

question were designed, at least in part, to launder money, not that the transaction involved money that was previously laundered through other means." ***Id.***

It must be remembered, however, that in examining whether a specific transaction was designed to launder money, we are not required to view that transaction in total isolation. To the contrary, we have expressly observed that:

> [I]n order to establish the design element of money laundering, it is not necessary to prove with regard to any single transaction that . . . the particular transaction charged is itself highly unusual . . . . That is, it is not necessary that a transaction be examined wholly in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds.

***Willey***, 57 F.3d at 1387.

Contrary to August's suggestion, a particular transaction must be viewed in context when determining whether it was designed to conceal. As a result, "a design to conceal on a particular transaction may be imputed to a subsequent transaction" if the subsequent transaction, while innocent on its face, is part of a larger money laundering scheme. ***Id.*** at 1386; *see also* ***Garcia-Emanuel***, 14 F.3d at 1478 (also acknowledging that design to conceal may be imputed from one transaction to another). Evidence that may be considered when determining whether a transaction was designed to conceal includes:

> statements by a defendant probative of intent to conceal; *unusual secrecy surrounding the*

11

> *transaction;* structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; *using third parties to conceal the real owner; a series of unusual financial moves cumulating [sic] in the transaction;* or expert testimony on practices of criminals.

*Garcia-Emanuel*, 14 F.3d at 1475-76 (emphasis on evidence present in this case).

In this case, the record reflects that August was expressly forbidden from hiring related companies where there was a potential conflict of interest. Nonetheless, August opened the CQ&S bank account at issue here, named himself as the sole signatory, and proceed to have repair work done at the Richwood Place Apartments in the name of CQ&S. To conceal his identity from JER, and to begin the process of laundering the $56,000 in illegal proceeds, August instructed Burns to represent himself to JER as the sole proprietor of CQ&S. Accordingly, Burns, and not August, appeared at the offices of JER, acted as the president of CQ&S, and accepted the $56,250 check. Those transactions, which undeniably give rise to an inference of intent to conceal, put the $25,000 check-transfer in proper perspective.

After the illegal proceeds were safely deposited in CQ&S's account, one final step remained in the money laundering scheme. August needed to convert those proceeds into a more legitimate form -- from money belonging to CQ&S, to money which was under the control of TAGI. That was accomplished through the $25,000 check-

12

transfer.

It is true that the $25,000 check-transfer, when viewed in isolation, appears to be nothing more than an ordinary transaction between two bank accounts, conducted in plain view. However, when we look beyond the face of that transaction, and look at the transactions which immediately preceded it, we find strong and compelling evidence that the $25,000 transfer was not an innocent transaction. The record gives rise to a strong inference that the $25,000 transfer was the final step of a larger money laundering scheme willfully designed to give August access to the illegal proceeds. We conclude that there is sufficient evidence of a design to conceal. August's money laundering conviction must stand.

### III.

Montgomery appeals all of her convictions on sufficiency of the evidence grounds. She properly preserved that claim for appellate review by moving for judgment of acquittal at the close of the government's case, and at the end of trial. The district court denied those motions. We review each of Montgomery's convictions in turn.

Montgomery was convicted of conspiracy under count one. To establish a conspiracy in violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt: (1) an agreement between two or more people, (2) to commit a crime against the

13

United States, and (3) an overt act by one of the conspirators to further the objectives of the conspiracy. 18 U.S.C. § 371; *United States v. Dupre*, 117 F.3d 810, 820 (5th Cir. 1997), *cert. denied,* 118 S. Ct. 857 (1998). The government is not required to rely on direct evidence of a conspiracy, as each element may be proven by circumstantial evidence. *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir.), *cert. denied*, 513 U.S. 892 (1994). Moreover, the agreement need not be an express or formal agreement; a tacit understanding is sufficient. *United States v. Hopkins*, 916 F.2d 207, 212 (5th Cir. 1990).

Here, Montgomery contends that there is insufficient evidence to support her conspiracy conviction because the government failed to prove that she knowingly participated in the conspiracy. Her argument is unconvincing. At trial, there was abundant evidence that Montgomery falsified invoices, time sheets, and insurance certificates. There also was evidence that Montgomery ordered Tennie to do the same. The record sufficiently supports the finding that Montgomery knowingly participated in the alleged conspiracy.

Montgomery also was convicted on four counts of illegal participation with the RTC, in violation of 18 U.S.C. § 1006, with accompanying convictions for aiding and abetting in the commission of those crimes, in violation of 18 U.S.C. § 2. Those counts were based on various specified transactions involving JER and BFFSA.

14

To prove illegal participation under § 1006, the government must demonstrate: (1) the defendant's connection with a protected institution as specified in the statute; (2) direct or indirect receipt of some benefit from the transaction in question; and (3) intent to defraud. 18 U.S.C. § 1006; *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir.), *cert. denied*, 510 U.S. 1013 (1993). We have observed that § 1006 is "a typical conflict of interests prohibition." *Brechtel*, 997 F.2d at 1116. "[A] fiduciary who benefits or causes loss to [a protected institution] by knowingly subordinating the institution's interests to his own in a transaction for which he has responsibility acts with the 'intent to defraud' required by § 1006." *Id.*

In this case, Montgomery claims that her illegal participation convictions cannot stand because there is no evidence that she intended to defraud the RTC. Montgomery also argues that there is insufficient evidence that she profited from her business associations with JER, BFFSA, and the RTC. We have reviewed the record and find no merit to her arguments.

Montgomery was also convicted on six counts of submitting false claims to the RTC through ONTRA, a SAMDA contractor, in violation of 18 U.S.C. § 287, with accompanying convictions for aiding and abetting in the commission of these crimes in violation of 18 U.S.C. § 2. In order to sustain a conviction under § 287, the government must prove: (1) that the defendant presented a

15

false or fraudulent claim against the United States; (2) that the claim was presented to an agency of the United States; and (3) that the defendant knew that the claim was false or fraudulent. 18 U.S.C. § 287; *United States v. Okoronkwo*, 46 F.3d 426, 430-31 (5th Cir.), *cert. denied*, 516 U.S. 833 (1995).

On appeal, Montgomery argues that there is insufficient evidence that she knew the claims were false, or that she knowingly participated in the fraudulent scheme. Her argument fails. There is sufficient evidence in the record demonstrating that Montgomery possessed the requisite criminal intent.

Finally, Montgomery was convicted on four counts of making a false statement to the FDIC, in violation of 18 U.S.C. § 1007, with accompanying convictions for aiding and abetting in the commission of these crimes in violation of 18 U.S.C. § 2. The false statements alleged in the four counts involve false, or grossly inflated, invoices and checks that were submitted to the FDIC in connection with repair work and maintenance performed at Cavender's. To establish guilt under 18 U.S.C. § 1007, the government must prove: (1) the defendant made a false statement; (2) the defendant knew the statement was false; and (3) the statement was made for the purpose of influencing, in any way, the FDIC's actions. 18 U.S.C. § 1007; *see United States v. Taliaferro*, 979 F.2d 1399, 1405 (10th Cir. 1992) (listing roughly the same elements).

Here, Montgomery asserts that there is a lack of evidence that she knew the specified invoices and checks were false. Montgomery admits that there is evidence that she instructed Tennie and others to generate those documents, but contends that there is no evidence that she was aware of their contents. Her argument is unpersuasive. There is evidence that Montgomery was aware of the true costs associated with maintaining Cavender's, but nonetheless instructed Tennie to generate false bids and invoices. Moreover, there is evidence that Montgomery personally disbursed the incorrect payments that she received. There is sufficient evidence supporting her convictions for making false statements to the FDIC in violation of 18 U.S.C. § 1007.

IV.

August contends that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose various pieces of exculpatory evidence at trial. Montgomery and Alexander have adopted this argument pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure. *See* Fed. R. App. P. 28(i) (providing that in cases involving more than one appellant, any appellant may adopt by reference any part of the briefs of another). This Court's review of *Brady* claims is *de novo*. *See* ***United States v. Green***, 46 F.3d 461, 464 (5th Cir.), *cert. denied*, 515 U.S. 1167 (1995).

To establish a ***Brady*** claim, an appellant must demonstrate:

17

(1) that evidence was suppressed, (2) that the evidence was favorable to the accused, and (3) that the evidence was material. *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991). As to the third element, "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Garcia*, 917 F.2d 1370, 1375 (5th Cir. 1990).

Here, August contends that the government violated *Brady* by allegedly engaging in a wide-ranging pattern of evidentiary abuses at trial. The first claimed incident is the government's alleged failure to produce a case agent's audit showing that ONTRA owed TAGI $34,408 in back management fees. August contends that the agent's audit was critical to his defense because it substantiated his claim that ONTRA did not pay him in a timely manner, forcing him to move money between accounts, and causing him to submit duplicate and erroneous invoices. August's argument is without merit. At trial, there was overwhelming evidence that August intentionally falsified and inflated invoices in a deliberate scheme to defraud the government. In finding August guilty of conspiracy, illegal participation, and the other related crimes, the jury implicitly rejected the thrust of his defense, that every

18

incident of fraudulent billing was the innocent byproduct of untimely reimbursements.

Furthermore, August admits on appeal that "[o]n cross-examination, one government witness stated that ONTRA still owed TAGI approximately *$187,000*." (Emphasis added.) Thus, it is clear that the case agent's audit showing $34,408 in back management fees was not only cumulative in nature, but it also would have had the effect of weakening August's defense by indicating a lesser amount of back management fees. August cannot make out a **Brady** claim on this basis.

August also contends that a **Brady** violation occurred because the government initially failed to produce the criminal histories of its witnesses.[4] August places particular emphasis on the government's alleged failure to disclose that Victor Ihezukwu, a government witness who was a former security guard for Guardco, was a Nigerian national who was possibly residing in the United States illegally. This argument is without merit. August objected to the government's failure to produce the criminal histories of its witnesses at trial. In response, the government provided the criminal histories of all its witnesses before they testified. With this information, defense counsel cross-examined some

_____

[4] Burns raises this same issue on appeal. His argument fails for the reasons as discussed.

witnesses and declined to cross-examine others.  Accordingly, this *Brady* claim fails.

August next argues that the government violated *Brady* when it initially produced only two pages of a seven-page document that contained a favorable review of TAGI's management of the Green Oaks Apartments.  This claim is without merit because the other five pages were eventually produced by the government, and the entire document was introduced as evidence with a curative instruction from the court.

Finally, August calls our attention to the government's failure to produce a federal agent's report stating that Tennie had told the agent that Gordon, a co-defendant and employee of TAGI, was not present at Club Reflections on the Saturday night following the search of TAGI's offices.  This statement conflicted with the trial testimony of Mitch Robinson, a defendant turned government's witness, that Gordon was at Club Reflections that Saturday night assisting the other defendants in burning incriminating documents. August's argument fails because this one statement, as it specifically relates to the four appellants in this case, is not sufficient "to put the whole case in such a different light as to undermine confidence in the jury verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

V.

20

Alexander and Burns contend that the district court erred by admitting the trial testimony of two investigating agents -- Murphy and Lynch -- regarding statements Alexander and Burns made to the agents during non-custodial interviews.  They also contend that, once the district court decided to admit the testimony, it erred by refusing to grant their motions for a severance.  Severance and evidentiary rulings are reviewed for abuse of discretion.  ***United States v. Mulderig***, 120 F.3d 534 (5th Cir. 1997).

In 1993, agent Murphy questioned Alexander in a non-custodial interview.  In that conversation Alexander told the agent that she was in charge of Guardco's paperwork, which entailed writing checks and submitting invoices.  Alexander, however, also told agent Murphy that Guardco was managed by August and TAGI.  She advised the agent that TAGI furnished the information necessary to prepare Guardco's invoices; that Guardco's checking account belonged to August; that August used Guardco's checking account; and that she supplied August with blank, signed Guardco checks.

In 1993, agent Lynch spoke with Burns in a non-custodial interview.  During that conversation, Burns told agent Lynch that he delivered a CQ&S bid to JER, and signed various documents while he was there.  However, like Alexander, Burns advised the agent that TAGI and August were managing the operation; TAGI had prepared the documents; and August had instructed Burns to sign and deliver them.

21

On December 6, 1995, while the trial was proceeding, the government advised the parties that it intended to introduce Alexander's and Burns' statements through the testimony of the interviewing agents. August objected. He claimed that, because neither Alexander nor Burns were taking the stand, the express mention of his name in the agents' testimony would deny him his Sixth Amendment right to confrontation under *Bruton v. United States*, 391 U.S. 123 (1968). In that case, the Supreme Court held that when the prosecution seeks to admit the statement of a non-testifying defendant, and portions of the statement incriminate a co-defendant, those portions must be omitted to protect the co-defendant's Sixth Amendment right of confrontation. *Bruton,* 391 U.S. at 126. The district court in this case was persuaded by August's argument, and ordered that the agents' proffered testimonies be redacted to omit all incriminating references to August and the other codefendants. Alexander and Burns objected.

They argued, and continue to argue on appeal, that the district court erred in admitting the agents' testimonies in redacted form. Alexander and Burns allege that the redacted versions fail to include statements in which they advise the agents that they were working under the orders of TAGI and August. Alexander and Burns argue that with those exculpatory statements missing, the jury was left with the false impression that they had acted alone. Alexander and Burns allege that the redactions, while

22

effective at protecting their codefendants' Sixth Amendment rights under **Bruton**, violated their own Fifth Amendment rights to a fair trial. Alexander and Burns also complain they were denied their right to confrontation under Sixth Amendment because the district court would not allow cross-examination in areas that had been redacted.

Although speaking in general terms of the Fifth and Sixth Amendments, Alexander and Burns have implicitly recognized that strict compliance with **Bruton** may at times violate the evidentiary rule of completeness. Under that long-standing rule, "the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." 7 J. Wigmore, Evidence in Trials at Common Law § 2113, p. 653 (J. Chadbourn rev. 1978); *see also* **Beech Aircraft Corp. v. Rainey**, 488 U.S. 153, 171 (1988) (quoting this passage while discussing the rule of completeness). In addition to ensuring that a court has an accurate representation of a declarant's statement, the rule guards against "the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material." **Beech Aircraft Corp.**, 488 U.S. at 172 n.14. Rule 106 of the Federal Rules of Evidence, which partially codifies the rule of completeness, provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106.

When it appears that the literal compliance with *Bruton* may abridge the rule of completeness, a district court must decide whether a severance is necessary. That determination, which is within the sound discretion of the district court, *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993), must be based on whether the admission of the edited statement would distort the meaning of the original in a way that gives rise to "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

In this appeal, Alexander and Burns describe several instances where the agents' testimonies fail to recount statements in which Alexander and Burns expressly implicate August. They contend that the omitted testimony is exculpatory in nature because it supports their defense at trial that they were merely acting on August's orders and did not possess the necessary criminal intent. Having carefully reviewed the agents' testimony, and the challenged omissions, we find no reversible error.

We do not quarrel with the claim that many of the omitted statements expressly implicate August in the alleged wrongdoing.

24

But very few of those statements are exculpatory, in the true sense of the word, as to Alexander and Burns specifically. There is an important distinction, we think, between statements that implicate others in shared wrongdoing, and statements that free one from blame. In this case, most of the omitted statements portray August as the head of the conspiracy, but do nothing to lessen the guilt of Alexander and Burns.

The few omitted statements that are exculpatory in nature are harmless in light of the record as a whole. The basic theory of Alexander's and Burns' defense was that they were minor participants who were simply following August's orders. What Alexander and Burns fail to consider in pressing that theory, however, is that "following orders" can only be a defense when a person had no idea that his conduct is criminal. Here, there is an abundance of evidence that Alexander and Burns knew their conduct was illegal. Thus, the fact that it was authorized and orchestrated by August cannot insulate them from criminal liability. *See* **McNamara v. Johnston**, 522 F.2d 1157, 1165 (7th Cir. 1975) ("it is well established that an agent cannot be insulated from criminal liability by the fact that his principal authorized his conduct"), *cert. denied*, 425 U.S. 911 (1976). The omission of any exculpatory statements was harmless error.

VI.

At sentencing the district court enhanced Montgomery's offense level by two levels for obstruction of justice under § 3C1.1 of the Sentencing Guidelines. *See* U.S.S.G. § 3C1.1 (1995). Another three levels were added pursuant to § 3B1.1(b) of the Guidelines, on the finding that Montgomery occupied a managerial position in criminal activity involving five or more participants. *Id.* § 3B1.1(b). The court also held Montgomery responsible for $346,194, the full amount of the loss minus $34,408, the amount the district court found ONTRA still owed TAGI, which enhanced her offense level by another eight levels pursuant to § 2F1.1(b)(1)(J). With a total offense level of 21, and a criminal history category of I, Montgomery's guideline range was 37-46 months imprisonment. The court sentenced her to 37 months.

On appeal Montgomery challenges those three separate enhancements. Clear error is our standard of review for the district court's finding that Montgomery obstructed justice, *United States v. Velgar-Vivero*, 8 F.3d 236, 242 (5th Cir. 1993), *cert. denied*, 511 U.S. 1096 (1994), for the finding that Montgomery was a manager or supervisor, *United States v. Valencia*, 44 F.3d 269, 271-72 (5th Cir. 1995), and for the district court's determinations regarding the amount of loss under U.S.S.G. § 2F1.1. *United States v. Wimbish*, 980 F.2d 312, 313 (5th Cir. 1992), *cert. denied*, 508 U.S. 919 (1993). Additionally, the commentary to § 2F1.1 provides that "[f]or the purposes of subsection (b)(1), the loss need not be

26

determined with precision.  The court need only make a reasonable estimate of the loss, given the available information."  U.S.S.G. § 2F1.1 cmt. 8.

Having reviewed the record, we have little doubt that Montgomery occupied a managerial position in the conspiracy and obstructed justice after the government began its investigation of the case.  Further, we do not agree with Montgomery's contention that the district court erred in holding her responsible for the full amount of the loss.  We affirm the district court with regard to Montgomery's sentence.

VII.

Burns contends that the district court erred in giving him a two-level increase for more than minimal planning under § 2F1.1(b)(2) of the Guidelines.  *See* ***id***. § 2F1.1(b)(2).  Burns also complains that the district court wrongly held him responsible for $48,600 in losses.  We review the district court's determination regarding minimal planning for clear error.  ***United States v. Brown***, 7 F.3d 1155, 1159 (5th Cir. 1993).  Amount of loss is reviewed under the same standard.  ***Wimbish***, 980 F.2d at 313.

The Sentencing Guidelines provide for an enhancement of two offense levels "[i]f the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim." U.S.S.G. § 2F1.1(b)(2).  Under the Guidelines "more than minimal

27

planning" is defined as "more planning than is typical for commission of the offense in a simple form," or "[taking] affirmative steps . . . to conceal the offense." U.S.S.G. § 1B1.1 cmt. 1(f). The Guidelines further provide that "'[m]ore than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." *Id*.

Burns argues that the district court erred in finding more than minimal planning because the record contains no evidence that he took affirmative steps to conceal his crimes. According to Burns, he was linked to only one scheme, and did not engage in repeated criminal acts. Burns argument is plainly contradicted by the record. He falsely posed as the owner and president of CQ&S when he bid on the repair work at Richwood Place Apartments. Burns also went twice to JER's offices to accept checks that JER had issued to CQ&S. On this evidence we cannot conclude that the district court's determination of more than minimal planning was clearly erroneous.

Burns further asserts that the district court erred in finding him responsible for $48,600 in losses because he only received $4,193 for his part in the scheme. In support of that argument Burns relies on *United States v. Smithson*, 49 F.3d 138, 144 (5th Cir. 1995), a case where we recognized that under U.S.S.G. § 2F1.1, application note 8, a sentencing court may utilize the offender's

gain as an *alternative* valuation method for assessing the amount of loss when the loss is difficult to determine. Burns' argument fails because he has not shown that the amount of loss was difficult to ascertain. Furthermore, there is more than enough evidence in the record to support the district court's loss calculation. We affirm Burns' sentence.

## VIII.

Based on the foregoing reasons, we affirm the convictions of appellants August, Montgomery, Alexander, and Burns. We also affirm the sentences of Montgomery and Burns.