IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-50358
_____

JOHN ALBERT BURKS,

                                        Petitioner-Appellant,

versus

GARY L. JOHNSON, Director, Texas Department
of Criminal Justice, Institutional Division,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
(97-CV-98)
_____

January 7, 2000

Before JOLLY, WIENER, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

     This habeas corpus appeal is brought by John Burks, who was

sentenced to death after his conviction in Texas state court for

the murder of Jesse Contreras.  The district court denied habeas

corpus relief but granted Burks a certificate of appealability

("COA") on two issues: first, on the alleged failure to disclose

exculpatory information about the identity of the killer, and,

second, the admission of evidence at sentencing that was alleged to

lack credibility.  On appeal, Burks attempts to raise two more

issues for which he lacks a COA: first, the exclusion of an alleged

_____

     [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

confession by a third party to the murder of Jesse Contreras, and, second, the failure to disclose exculpatory information relating to a second murder to which Burks was alleged to have confessed. We deny relief.

I

On Friday, January 20, 1989, Jesse Contreras was shot during a robbery of his store, Jesse's Tortilla Factory, in Waco, Texas. After several weeks in the hospital, Contreras died. The police eventually arrested John Burks for the crime.

Burks began planning the robbery weeks before, and he was not shy about it. In late December 1988, Burks asked his cousin, Ike Weeks, to help in a robbery, but Weeks refused. A couple of weeks later, Burks asked Weeks for some .25- or .32-caliber cartridges. Again, Weeks refused.

Sometime in early January, Burks also approached Aaron Bilton. Burks, complaining of a need for money, asked Bilton to help in the scheme to "knock off Jesse [Contreras]." Unlike Weeks, Bilton agreed.

At about the same time, Burks went to his half-brother, Louis McConnell, to see whether Louis owned a gun or knew someone who did. Louis did not. One week later, Louis came home to find Burks, Louis's brother, Bishop McConnell III, Carlton Johnson, and Victor Monroe sitting in the den. There was a small caliber pistol and a dark navy or black stocking cap on the table. Louis later

2

testified that he saw Burks pick up the gun and stocking cap before leaving.

About one week before the robbery, Burks apparently still had not found any ammunition for his gun, so he approached Johnny Cruz, a local grocer, and asked for some .25 caliber cartridges, once again without success.

On January 19, Weeks happened to see Burks, Mark McConnell, and Aaron Bilton talking in an alley. Weeks heard Burks tell Mark to pick Burks up the following day, and that Mark would receive some money and a bag of marijuana for his help.

By this point, Burks had developed the following plan. The robbery was set for Friday, because that was the day Contreras normally cashed checks. Burks wanted to commit the robbery at noon, but because Bilton had to be at work then, they changed the time to 11:00 a.m. Bilton was to enter Jesse's Tortilla Factory first to see who was there. If there was no one around, he was to return to the car and tell Burks. Mark was to receive $100 for his participation and the use of his car.

Vincent Guillem, one of Burks's neighbors, was in his front yard on the morning of the offense, January 20. Between 10:00 a.m. and 10:30 a.m., Mark McConnell drove up in his green, four-door Chevrolet. Guillem saw four people in the car--Bishop McConnell III, Mark, Burks, and someone Guillem could not identify. Burks got out of the car and asked Guillem whether he had any .25-caliber cartridges. When Guillem said no, Burks walked across the street

to his own house and later returned to Mark's car. Burks and Mark then left alone, without Bishop or the other passenger.

Shortly afterwards, Burks and Mark picked up Bilton. The three then proceeded to Bilton's uncle's house. When they arrived, Bilton went into his uncle's house and watched television while Mark drove Bilton's aunt downtown. When Mark returned five minutes later, the three men drove to Jesse's Tortilla Factory.

When they arrived, Bilton entered the store, ostensibly to purchase corn tortillas, but Contreras had not made any that morning. Bilton then returned to the car and announced that Contreras was the only person inside. Burks told Bilton to go back and purchase flour tortillas instead while making certain that Contreras was alone. Bilton did so and again returned to the car. At that point, Burks told Mark to let him out and then to drive to a side street and park. Wearing a dark stocking cap, Burks got out of the car and started toward the store's entrance. Mark and Bilton did as instructed, and about five minutes later, Burks arrived at the car holding his stocking cap in his hands. Bilton thought that the stocking cap had something in it, but Burks said that he did not get any money. The three then left and took Bilton to work. Bilton later testified that he did not know that Contreras had been shot until that evening's local news report.

At about 11:00 a.m. that same day, Victor Macias drove to Jesse's Tortilla Factory to cash a check. He observed a short black man carrying a dark object in his hand and "trotting" towards

4

a green late sixties model car parked on the side of a road near Jesse's Tortilla Factory. The man got into the backseat of the green car. When Macias arrived at Jesse's Tortilla Factory, he saw Jesse Contreras, the store owner, running towards the side of the building and blood on the pavement trailing from the building's front door. No one was in the store, but there was blood on the floor. Macias went back outside and he saw a green car speeding away. When Macias went back inside the building, Contreras was calling his daughter on the telephone. Macias stayed until she arrived. When Gloria Contreras Diaz got to the store, her mother was already tending to her father. Contreras told them a black man with a mask had tried to rob him, and that when Contreras had thrown a trash can at the robber, the robber had shot him. Contreras died twenty-seven days later.

A few days after the botched robbery, Burks's aunt accused him of having been seen at Jesse's Tortilla Factory when Contreras was shot. Burks denied this, saying that no one had been there when he left. He then threatened his aunt when she said that she would call the police if she found out that he had shot Contreras.

The investigation began with an analysis of the evidence from the scene. A firearms' expert determined that two .25-caliber bullets removed from Contreras's body were fired from the same gun, probably a .25-caliber semi-automatic Raven Arms pistol--a compact pistol easily carried in a pocket and sometimes referred to as a "Saturday Night Special." Four other spent bullets found at the

crime scene were also .25-caliber. A .25 caliber semi-automatic Raven Arms pistol can hold up to six cartridges. In addition, the police found five spent .25 caliber shell casings at the crime scene.

While separately talking to Contreras and Macias, Detective Price of the Waco Police Department obtained a description of the suspect as being a black male of small build, 5'6" to 5'7" tall. Price soon ascertained that the car involved was a green four-door mid- to late-sixties model Chevrolet. Four days after the offense, Price observed Mark McConnell driving a car matching that description, and the police arrested him. The police also soon arrested Bilton.

In February 1989, Detective Price notified the police in Harlingen that a warrant had been issued for Burks's arrest in connection with this offense. During the first week of March 1989, two Harlingen police officers in a patrol car noticed Burks walking on a sidewalk in the western part of town and drove up behind him. When Detective Davilla called to Burks and identified himself as a police officer, Burks ran. The police eventually captured him and took him into custody.

Burks was convicted of capital murder and sentenced to death in 1989. He appealed to the Texas Court of Criminal Appeals, which affirmed his conviction and sentence in early 1994. The United States Supreme Court denied certiorari in early 1995. In mid 1995, Burks sought habeas corpus relief in Texas state court. The trial

court held an evidentiary hearing in November 1995 and issued findings of fact and conclusions of law in January 1996. The court of criminal appeals then denied relief on October 16, 1996. The United States Supreme Court again denied certiorari in the spring of 1997.

On July 21, 1997, Burks filed his federal habeas petition. The district court granted the state's summary judgment motion and denied Burks's application in the spring of 1998. Motions for a new trial and a request for additional findings of fact were also denied. Burks then sought and received from the district court a certificate of appealability on some, but not all, of the issues he raises on appeal.

## II

### A

Before moving to the substance of Burks's appeal, we must first determine the appropriate standards of review. We confront two sets of issues on this appeal, one for which the district court granted certificates of appealability, and the other for which Burks has not yet obtained such certificates. We approach each set differently. We start with the issues for which Burks already has a COA. The first of these is that the state failed to disclose exculpatory information about statements overheard by two emergency room nurses about the killer's identity, denying Burks his due process rights under Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The second issue on which a COA

7

was issued is that evidence lacking credibility was admitted during sentencing, and that the admission violated Burks's due process rights under Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1958).

The district court applied the AEDPA standard to review the state court's denial of habeas relief on these claims because Burks filed his federal appeal after April 24, 1996, the date that the AEDPA became active. See Lindh v. Murphy, 521 U.S. 320, 324-26, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)(establishing the date AEDPA became active). Because the district court made a summary judgment determination, we review de novo, and we use the same standard as the district court.

Burks contends, however, that the AEDPA standard is being retroactively applied to him contrary to established principles of law. In Landgraf v. USI Film Products, 511 U.S. 244, 281, 114 S.Ct. 1483, 128 L.Ed.2d 229, the Supreme Court held that without a clear statement of retroactivity in the statute itself, courts should not apply a statute retroactively. Application of the AEDPA standard is retroactive and impermissible when it "attach[es] new legal consequences to events completed before its enactment." Id. at 270.

We agree that there is no statement of retroactivity in the AEDPA. We therefore agree that the AEDPA's application cannot be allowed to have a retroactive effect in this case. As for its retroactive effect in this case, Burks concedes that he filed his

8

appeal in federal court after the April 24 effective date.  He points out, however, that his state court habeas proceedings were already underway before the effective date of the AEDPA.  He then asserts that, had he known that the AEDPA would apply later to those federal proceedings, "perhaps he could have acted differently" in conducting his state court proceedings.  Thus, he concludes, application of the AEDPA standard attached new legal consequences to his actions during the state court proceedings that were underway before the statute became active.[1]

We cannot accept this argument.  As explained in Drinkard v. Johnson, 97 F.3d 751, 766 (5th Cir. 1996), for application of the new law to have a retroactive effect, a defendant must have relied on the status of the law before its change.  Burks cannot point to such a reliance.  He fails to explain how his conduct would have been any different in state court had he known that the AEDPA's standard would apply.  Thus, application of the AEDPA to this federal appeal does not have a retroactive effect on Burks or his conduct of the state court proceedings.

Consequently, the standard of review that we shall apply to the two issues on which the district court granted a COA are found

---

[1]Burks also contends that the state habeas court was less careful because it expected federal review under the less deferential standard, and so the district court's application of that standard denied him adequate habeas review.  This perception of the state courts is not only untrue, but is condescending.  It is not, therefore, a grounds for relief.

in the AEDPA.  Under that statute, federal courts cannot grant writs of habeas corpus unless:

(1) the state proceedings resulted in a decision contrary to, or involving an unreasonable application of, clearly-established federal law as determined by the Supreme Court.

(2) the state proceedings were based on an unreasonable determination of the facts.

28 U.S.C. § 2254.  The issues presented in the COA turn on a determination of facts by the state court.  Thus, under (2) above, state court factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Trevino v. Johnson, 168 F.3d 173, 181 (5th Cir. 1999), cert. denied, ___ U.S. ____, 120 S.Ct. 22, ____ L.Ed.2d ____, 68 U.S.L.W. 3136 (1999).

B

We now turn to the two issues for which Burks did obtain a COA from the district court.

(1)

Burks's first claim is that he was denied constitutional due process of law when at trial the state failed to disclose exculpatory evidence.  Prosecutors violate a defendant's right to due process when they fail to disclose material evidence favorable to the defense.  Brady, 373 U.S. at 87.  Thus, there must be both (1) a failure to disclose, and (2) the evidence that was not disclosed must have been material and favorable to the defense.

10

The evidence that supposedly was not disclosed to Burks is alleged statements overheard by two nurses at the hospital on the day of the shooting. Connie Mejia testified at the state evidentiary hearing that someone in the emergency room had said either that the killer spoke Spanish or that the killer spoke with a Spanish accent. Rebecca Adams thought she remembered someone saying that the killer spoke Spanish. Burks contends that this was exculpatory evidence because he does not speak Spanish, nor does he speak with a Spanish accent. He argues that because the prosecutors failed to provide his counsel with information about what the nurses overheard, a Brady violation occurred.

When Burks first raised this Brady claim in his state habeas proceeding, the court found against Burks on both Brady prongs. The court held, first, that prosecutors had, in fact, disclosed the evidence, and, second, that the evidence was not material because it "would not have made a difference between conviction and acquittal."

The first, and in this case, dispositive, question to answer is whether the material was disclosed. This is a factual determination, and we review the state court's finding of disclosure under the AEDPA's "reasonableness" standard of review. If that determination was reasonable, there is no reason to consider the materiality of the evidence.

We believe that the state habeas court's determination that this information was disclosed was reasonable. 28 U.S.C.

11

§ 2254(d).  One of the prosecutors testified to telling at least one of Burks's lawyers about the nurses' statements.  Burks's lawyers, on the other hand, all contend that they never received this information.  Thus, this is a credibility issue, and we cannot conclude that the state court's reliance on the prosecutor's testimony was unreasonable.  Or, stated differently, although Burks's attorneys deny receiving this information, their denial does not constitute clear and convincing rebuttal evidence that can set aside a credibility determination made by the state court.

Because this credibility determination was reasonable, we must conclude that the evidence was disclosed.  Burks has, therefore, failed to satisfy the first prong of Brady, and we need not address whether the evidence was material.

(2)

We now turn to the second issue on which the district court granted a COA.  This issue related to the sentencing phase of Burks's trial.  Burks challenges the admission of testimony during sentencing about his involvement in a murder unrelated to the Contreras killing, arguing that because this evidence was unreliable, its admission violated his due process rights.  The unrelated murder had occurred in 1982.  Burks had allegedly confessed to that crime to another prison inmate, his cousin, Gary Bridgewater.  At the time, the state had decided not to try Burks for the crime because of credibility concerns about Bridgewater.  During sentencing for the Contreras murder, however, prosecutors

12

introduced testimony implicating Burks in that murder as evidence of his "deathworthiness" under Article 37.071 § (b)(1) of Texas' Annotated Code of Criminal Procedure: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

The only basis upon which Burks attacks this evidence in this federal habeas corpus appeal is as follows: as part of his testimony that Burks had confessed to the earlier murder, Bridgewater explained that Burks's confession came when the two were discussing a newspaper article about the murder. Burks contends that Bridgewater's testimony was untrue, because there was no such newspaper article when the two men were together in prison and because Burks could not read. Burks argues, therefore, that admission of this testimony was a violation of Burks's due process rights because he was "sentenced on the basis of assumptions concerning his criminal record which were materially untrue." Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).

We will not consider Burks's arguments with respect to whether Bridgewater's testimony about the newspaper article proves that testimony unreliable because Burks failed to raise it either in state court or with the district court. Consideration of these facts is precluded because Burks did not exhaust the claim based on these facts in state court. Petitioners fail to exhaust their state remedies when they resort to material evidentiary support in

13

federal court that was not presented in state court.  Graham v. Johnson, 94 F.3d 958, 968 (5th Cir. 1996).  Moreover, because he failed to raise the issue before the district court, this claim is not properly before us, and should not be considered for the first time on appeal.  Davis v. Scott, 51 F.3d 457, 467 (1995).  Because this is the only argument his brief makes with respect to the unreliability of evidence at sentencing, he has presented no basis for relief on this issue.

### III

We now move to the remaining two issues for which Burks does not have a proper COA.

### A

There are also two issues Burks raises for which he does not have a COA.  He first charges that the trial court's decision to exclude testimony that someone else had confessed to the Contreras murder constituted a denial of due process under Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).  Burks also contends that the state, under Brady v. Maryland, failed to disclose exculpatory information that would have been material during sentencing.

Before we can review either issue, we must first determine whether a COA is appropriate.  We will treat his notice of appeal as a request for the COA.  Fed. R. App. P. 22(b)(2).[2]  Determining

---

[2]The rule reads: "A request addressed to the court of appeals may be considered by a circuit judge or judges, as the court

14

whether to issue a COA is a two-step inquiry.  First, a petitioner must demonstrate exhaustion of remedies in state court.  <u>Sterling v. Scott</u>, 57 F.3d 451, 453 (5th Cir. 1995).  Second, there must be substantial showing of denial of a federal right.  <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).[3]  With respect to the second prong, Burks need not show that he should prevail on the merits.  Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further.  <u>Id.</u>  If we determine that a COA is warranted, we then conduct a review under the AEDPA standard already discussed.

B

We first address the habeas claim concerning evidence excluded at trial.  Burks tried to call Regina Burks[4] to testify that, on the day of the murder, she had heard Bishop McConnell brag that he himself was the killer.  Bishop had been drunk at a bar at the time.  The trial court excluded Regina's testimony on hearsay grounds.  The Texas Court of Criminal Appeals, however, later held

---

prescribes.  If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals."

[3]Though these cases dealt with the grants of the pre-AEDPA Certificates of Probable Cause, the distinction is irrelevant.  We have previously held that the standard for obtaining either is the same.  <u>Murphy v. Johnson</u>, 110 F.3d 10, 11 (5th Cir. 1997).

[4]The two are not related.

15

that because Bishop's statement was against penal interest, the statement fell within an exception to the hearsay rule and was therefore improperly excluded. Burks v. State, 876 S.W.2d 877, 905 (Tex. Crim. App. 1994)(en banc). That court nevertheless concluded that the exclusion was harmless error because the statement was not credible. Id. at 906.[5]

Burks did not obtain a COA for his assertion that exclusion of Regina Burks's testimony constituted a denial of constitutional due process, rendering his trial fundamentally unfair. See Lowenfield v. Phelps, 817 F.2d 285, 196 (5th Cir. 1987). He bases his argument on Green v. Georgia, 442 U.S. 95. In that case, the Supreme Court held that exclusion of evidence highly relevant to a critical issue, where there were substantial reasons to assume its reliability, constituted a violation of the defendant's due process rights. Id. at 97. Fundamental to a Green claim, however, is that there be such substantial reasons to assume its reliability. In a similar case, where there were no such reasons, we held that there had not been a denial of due process even though the trial court had excluded testimony about the confession of someone other than the defendant. Little v. Johnson, 162 F.3d 855, 860 (5th Cir.

---

[5]Burks's first challenge, for which he does have a COA, is the manner in which the court of criminal appeals conducted its harmless error review. But because the Texas court treated its harmless error analysis as a matter of Texas law under Texas Rule of Appellate Procedure 81(b)(2), we cannot review the manner in which it conducted this analysis or its conclusions. The Texas court did not analyze the exclusion under either federal or constitutional law.

16

1998)(limiting Green to where there are "persuasive assurances of trustworthiness" with respect to the confession).

To obtain the COA, Burks must first demonstrate exhaustion of remedies in state court. Sterling, 57 F.3d at 453. It appears that Burks did raise this issue in state court in a vague manner, though the state court did not address it in its decision.

Having overcome the first hurdle, Burks must also establish that a court *could* hold that he has made a substantial showing of denial of a federal right or that the questions deserve encouragement to proceed further in order to obtain a COA. Barefoot, 463 U.S. at 893 n.4. We again note that the federal right asserted under Green is a due process violation because of the exclusion of evidence highly relevant to a critical issue, where there were substantial reasons to assume its reliability. Although Burks can satisfy the requirement that the identity of the murderer be a critical issue, Burks cannot establish that a court *could* find substantial reasons to assume the reliability of the confession.

It is true that the Texas Court of Criminal Appeals found evidence that "sufficiently corroborate[d] Regina Burks' testimony to render it admissible under R. 803(24)." Burks, 876 S.W.2d at 905. That court discussed six points of "evidence" in support. First, as the state court pointed out, Bishop made his "confession" "only hours after the offense occurred, and the record [did] not reflect that Bishop had any reason to lie or that he would gain

17

some advantage by admitting the offense." Burks, 876 S.W.2d at 905. Second, Louis McConnell testified that he might have seen Bishop handle a small caliber gun about a week before the offense. Third, because Victor Macias could not identify the black man at the scene, it arguably could have been Bishop. Fourth, the court pointed out that Bilton never testified that he saw Burks shoot Contreras, nor did Burks admit shooting Contreras. Fifth, Bilton testified that he did not hear any gunshots and that he did not see Burks with a gun on the day of the offense. Sixth, no gun was recovered from Burks.

Nevertheless, although the Texas court held that the confession should have been admissible, that does not mean that there were "substantial reasons to assume its reliability" for constitutional purposes under Green. The Texas court also concluded that the statement was of "questionable credibility," and that the impact of its admission at trial "would, at best, have been negligible."

Anything more than a passing glance at the "evidence" that supports the "confession" reveals the tenuous character of that evidence. Of the six items discussed above, only the first two are really evidence of an affirmative nature. The other four are merely minor gaps in the prosecution's case of direct evidence that might allow speculation about the possibility of another murderer, but only if the strong circumstantial evidence is discarded or discounted. Such questions can be raised in many cases, and they

18

do not constitute persuasive reasons to believe that the confession was reliable.

Indeed, even weighing the two points of affirmative evidence-- Bishop's lack of an incentive to lie and the fact that he may have handled a gun--against the other evidence presented at trial presents us with strong reasons to conclude that the confession was plainly false. First, according to Regina Burks, the first time she heard Bishop discuss the murder, he said, "*We* shot Jesse." It was only afterwards that he began taking credit. And at the time, as Regina Burks said, Bishop was "drunk," "staggering," "pretty out of it," and "about to fall." Second, Regina Burks testified that Bishop "was always talking trash like that," that "nobody ever pays no attention to him when he's drunk," and that nobody believed Bishop when he made the statement.

Third, it would have been almost impossible for Bishop to have committed the murder under the circumstances proved by the prosecution at trial. Most importantly, Bishop was not with the men who went to rob Contreras. Bilton testified that Bishop was not in the car when he, Burks, and Mark McConnell drove to Jesse's Tortilla Factory on January 20. Regina Burks happened to be at Guillem's house that same morning, and she saw that when Mark drove off with Burks in the car, Bishop was not with them. Moreover, Guillem, who also saw the car drive off, testified that Bishop was not in it. In addition, Burks told his aunt that there was no one at Jesse's Tortilla Factory after he left that morning. Thus,

19

unless we discard virtually all evidence adduced at trial, it is impossible to give the slightest credence to Bishop's "confession" except under the following scenario: he drove himself, he hid from Burks during the attempted robbery, he sneaked into the shop immediately afterwards and shot Contreras and then escaped unseen before Macias's arrival.

Thus, instead of constituting substantial reasons to assume the reliability of the statement, substantial evidence provides compelling reasons to confidently conclude that Bishop's confession was unreliable. Its exclusion, therefore, could not arguably constitute a violation of due process under Green. We therefore deny Burks's request for a COA on this issue.

C

The final issue Burks raises for which he lacks a COA is a second Brady claim, alleging a failure to disclose exculpatory evidence. This claim relates to evidence of the unrelated 1982 murder presented during sentencing, which we have discussed earlier. Burks had not been the only suspect in that 1982 murder. A man named James Shaw had allegedly confessed the same crime to an acquaintance, Gary Hawes. Hawes gave the police a written statement and took a polygraph, which indicated that he was lying about details of his story of Shaw's alleged confession. Hawes later admitted to those lies.

Burks contends that, although his lawyers were informed about what Hawes had told police about Shaw's "confession," they never

received Hawes's written statement or polygraph results from the state. Had he received these documents, Burks argues, he somehow would have more aggressively presented Shaw as the person who had committed the earlier murder.[6]

We begin by analyzing whether a COA is warranted. Burks did exhaust his state remedies by raising this issue in his state habeas proceeding. We therefore move to whether he has established the debatable denial of a federal right. Since at this stage we are merely determining the propriety of a COA, we are not governed by the AEDPA's deferential standard.

As we have earlier noted, the first prong of <u>Brady</u> asks whether there was a failure to disclose, and we begin with Burks's claim concerning Shaw's written statement. Burks points to his files, which lack several pages from that statement. These pages contained information not disclosed anywhere else. Burks's argument, however, is belied by his attorney's questions at trial. These questions reveal knowledge of information from those allegedly missing pages. In short, the evidence indicates that Burks's attorneys had this information at that time. Burks has

---

[6]Burks raises a connected issue for which he does have a COA: whether the district court's deference to the state court under the AEDPA was appropriate on this issue. Burks contends that because the state court did not issue specific findings of fact or analysis of law related to this habeas claim, the district court should not have deferred to its dismissal of the claim under the AEDPA. But because we independently hold that Burks has failed to establish an arguable federal right with respect to this claim, we need not determine what standard the district court should have used in reviewing the state court decision.

21

presented no explanation as to how his counsel had that knowledge other than from these pages.  Thus, the mere fact that these pages are now misplaced does not satisfy the first <u>Brady</u> prong--a showing that there has been a failure to disclose.

That leaves the polygraph testimony, which does not appear to have been disclosed.  We must, therefore, determine whether the polygraph results were exculpatory under <u>Brady</u>'s second prong.  To qualify, the undisclosed evidence must be "material," meaning that there is a reasonable probability that had it been disclosed, the result of the proceeding would have been different.  <u>United States v. Burns</u>, 162 F.3d 840, 851 (5th Cir. 1998).  "Mere speculation" that disclosure would have spurred defense counsel to additional investigation [does] not make that evidence "material." <u>Bartholomew</u>, 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995).

Based on this standard, a court could not hold that the polygraph results were exculpatory.  First, they were inadmissible. <u>Id.</u>  Even if they had been admitted, the fact that they showed that Hawes had lied would not have helped Burks.  Burks's argument for materiality, that having the results somehow would have led him to emphasize Shaw as a suspect in the earlier murder, is analogous to the argument the Supreme Court rejected as "mere speculation" in <u>Bartholomew</u>.  Thus, no court could hold that this evidence was exculpatory.  Because the claim fails to even debatably qualify under <u>Brady</u>'s second prong, we deny the COA on this issue and end our review.

22

IV

For the reasons stated herein, Burks's petition for habeas corpus relief is

D E N I E D.