# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 1, 2013

No. 11-11120

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JANICE EDWINA DEMMITT,

Defendant - Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and GARZA and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

A jury convicted Defendant-Appellant Janice Edwina Demmitt of conspiracy to launder monetary instruments, wire fraud, and money laundering. The district court sentenced her to seventy months imprisonment, a net term of five years supervised release, and restitution. Demmitt now appeals on the basis of alleged evidentiary errors, an improper jury instruction as to deliberate ignorance, and as to one of the money laundering counts, a fatal variance from the indictment or, alternatively, insufficient evidence to support the conviction. We AFFIRM in part, VACATE in part, and REMAND.

No. 11-11120

## I. BACKGROUND

### A.    Facts

Demmitt and her son, Timothy Fry ("Fry") lived and ran an insurance annuity business together.  They were both licensed agents for Allianz Life Insurance Company ("Allianz"), a legitimate company.  Demmitt and Fry secured several clients and set up annuity policies for them with Allianz.

Between 2007 and 2008, Fry began to defraud his customers.  He forged letters and e-mails purporting to be from Allianz that promised customers a fifty or one-hundred percent match for opening a new annuity.  Fry encouraged clients to come up with this money in a variety of ways, including cashing out their existing Allianz annuities.  Fry told clients he needed the money immediately in order to secure the match and that, to save time, the clients should provide cash or write him, not Allianz, a personal check.  Each time a client cashed out or borrowed against an existing Allianz annuity, Fry or Demmitt sent a fax from their office to Allianz's Minnesota office.  In most instances, whenever a change was made to an Allianz annuity, Allianz sent a letter to Demmitt to inform her of the changes, even if Fry had initiated them. Fry also obtained money from clients in other ways.  In one instance, Fry obtained a $30,000 check from a client by reporting that the client's husband, also a client, owed him the money.

In many cases, Fry deposited the fraudulently-obtained checks into his individual bank accounts or joint bank accounts he owned with Demmitt.  In some instances, Fry cashed the checks and then gave cash to Demmitt, who deposited it into her individual or joint bank accounts. Demmitt used the funds to cover business and personal expenses, including frequent purchases from QVC and payments to an interior decorator who was helping her set up a call center in a warehouse that required significant renovations.  Fry and Demmitt both bought new vehicles.

2

No. 11-11120

Fry also funneled some of his clients' money into an E*TRADE account that he used to fund his investment activities. Fry's discussions of his trading successes were convincing enough that his brother, Tad Fry ("Tad"), who lived in Colorado and periodically sent money to help with Demmitt and Fry's household expenses, requested that some of his money be invested in the E*TRADE account. In fact, Fry lost a significant amount of the money in the account, including fraudulently-obtained client money.

In the summer of 2008, some of Tad's logging equipment began to break down, and he asked Fry and Demmitt to send him money from the E*TRADE account. Tad believed Fry and Demmitt would send him his own money. Instead, they wired Tad money that was ultimately traced to client funds. For example, on August 21, 2008, Demmitt wired Tad $3,000 in client funds from one of her bank accounts.

Meanwhile, both Demmitt and Fry experienced significant cash flow problems of which Demmitt was aware. Because the business only had a handful of clients, annuity commissions alone were insufficient to cover business expenses, let alone personal expenses. Several people informed Demmitt of financial problems the business and Fry were having. For example, in September 2008, after Tad informed Fry that he needed more money to pay for the equipment, Fry sent Tad a series of checks that were ultimately returned for insufficient funds. Consequently, Tad's bank account became overdrawn by $47,000. Tad informed Demmitt that Fry's checks had been returned for insufficient funds. Demmitt was also informed several times that employee paychecks had been returned for insufficient funds.

In August 2008, clients Georgiann and Donald McCormick filed a complaint with the Amarillo Police Department, alleging that Fry had stolen $450,000 from them. Police Detective Celia Vargas was dispatched to Demmitt and Fry's business office to investigate. When Demmitt opened the locked door,

3

No. 11-11120

Vargas asked to speak with Fry, but Demmitt reported that he was not present. Upon Demmitt's question, Vargas informed her that she was investigating possible fraud being perpetrated by Fry. When Vargas requested to look around the property, Demmitt called to Fry, who appeared. Demmitt informed Fry that Vargas was there to investigate "financial fraud," thus qualifying Vargas's investigation in a way Vargas had not done.

In total, Fry defrauded over $700,000 from his clients.

**B.    Procedural History**

Demmitt and Fry were each charged with one count of conspiracy to launder monetary instruments, fifteen counts of wire fraud, and eleven counts of money laundering. All of the money laundering counts, except Count 27, were brought under 18 U.S.C. §§ 1957 and 2 and involved amounts over $10,000. Count 27 was brought under 18 U.S.C. § 1956(a)(1)(B)(i) and alleged, *inter alia*, that Demmitt transferred $3,000 to Tad knowing that the transaction was designed to conceal the illegal attributes of the money.

Fry pleaded guilty, signing a factual resume that, *inter alia*, asserted Demmitt had been involved in the scheme. Demmitt pleaded not guilty, and she was tried before a jury. At trial, Demmitt presented no witnesses or evidence, and she argued that Fry had been the sole perpetrator of the scheme. The jury convicted Demmitt of conspiracy to launder monetary instruments, eight counts of wire fraud, and all of the money laundering counts.

Demmitt now brings this appeal, raising four issues: (1) the district court reversibly erred when it permitted the Government to introduce Fry's factual resume as substantive evidence of Demmitt's guilt; (2) the district court reversibly erred when it permitted the Government to introduce witness Doris Streu's testimony; (3) the district court reversibly erred when it gave the jury a deliberate ignorance instruction; and (4) conviction under Count 27 was improper because the Government's evidence was a fatal variance from the

4

No. 11-11120

indictment or, alternatively, there was insufficient evidence that Demmitt satisfied the essential elements of the crime.

## II.  EVIDENTIARY ISSUES

Demmitt raises two evidentiary issues.  First, she argues that the trial court erred when it permitted the prosecution to introduce Fry's factual resume as substantive evidence of Demmitt's guilt.  Second, she argues that the trial court erred when it permitted the prosecution to introduce Streu's testimony regarding a loan her husband made to Fry.

We first address Demmitt's second argument.  As Demmitt has cited no authority in support of her contentions as to the impropriety of admitting Streu's testimony, we hold this argument waived.  *See* Fed. R. App. P. 28(a)(9) ("The appellant's brief must contain . . . citations to the authorities . . . ."); *see also Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) (collecting citations) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

We now turn to Demmitt's argument that the trial court erred when it permitted the prosecution to introduce Fry's factual resume as substantive evidence of Demmitt's guilt.

### A.    Standard of Review

Where a party has properly preserved an objection, as is the case here, we review evidentiary rulings for an abuse of discretion, subject to a harmless error analysis.  *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 757 (5th Cir. 2008) (citation omitted);  *United States v. Crawley*, 533 F.3d 349, 353 (5th Cir. 2008) (citation omitted).  "Reversible error occurs only when the admission of evidence substantially affects the rights of a party."  *Crawley*, 533 F.3d at 353 (citations omitted).

"A nonconstitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict."  *United States v.*

No. 11-11120

*El-Mezain*, 664 F.3d 467, 526 (5th Cir. 2011) (citations and internal quotation marks omitted). "Under this standard, we ask whether the error itself had substantial influence on the jury in light of all that happened at trial; if we are left in grave doubt, the conviction cannot stand." *Id.* (citations and internal quotation marks omitted).

**B.     Discussion**

We now address the merits of Demmitt's contention as to the introduction of the factual resume. Soon after Fry was sworn in as a witness for the prosecution, the following exchange occurred:

> Q [Prosecutor]. And Government's [Exhibit] 17-2, is that the factual resume that provides the factual basis for your plea of guilty that you entered?
> A [Fry]. Yes.
> Q. And does it bear your signature, along with that of your lawyer?
> A. Yes.
>
> [Prosecutor]:     The     Government     offers Government's Exhibit . . . W17-2.
>
> [Counsel for Demmitt]: Your Honor, both of these documents are hearsay. They're out-of-court statements that are being offered for the truth of the matter asserted.
>
> The Court: Admitted.
>
> Q (By [Prosecutor]): Did you plead guilty to this on July the 28 of 2011?
> A. Yes.
> Q. And prior to your – during your plea of guilty, were you sworn in?
> A. Yes.
> Q. Did you raise your right hand and promise to tell the truth?
> A. Yes.
> Q. And did you swear that everything contained in the factual resume was true and correct?
> A. Yes.
>
> [Prosecutor]: I'll pass the witness.

No. 11-11120

Fry's factual resume attributes every aspect of the fraud to both himself and Demmitt.  On cross-examination, Fry testified that he did not remember most of his fraudulent activities due to heavy medication, but that he did not recall Demmitt's involvement in the fraud.  He explained that he did not believe he was representing Demmitt was part of the fraud when he signed the factual resume and that, before he signed the factual resume, he had informed the prosecutor that Demmitt was not involved in the scheme.  Fry also stated that he had informed Demmitt that his E*TRADE investments were doing well.  However, Fry also conceded Demmitt's awareness of particular aspects of the fraud, such as withdrawals from client annuity accounts.

Demmitt argues that the factual resume was impermissibly admitted hearsay.  The Government disputes this characterization, claiming that the factual resume is admissible non-hearsay under Federal Rule of Evidence 801 as an adoption or as a prior inconsistent statement.  We disagree with the Government's contentions.

As is well-known, hearsay is a statement, including a "written assertion . . . that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(a), (c).  Hearsay is not admissible unless a statute or rule provides otherwise.  Fed. R. Evid. 802.  In some instances, however, a declarant-witness's prior statement is not hearsay.  The Government presses two of those non-hearsay situations here: (1) when the declarant adopts the prior statement and (2) when the prior statement is inconsistent with the declarant's testimony.  Fed. R. Evid. 801(d).

*1. Adoption*

"If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem."  Fed. R. Evid. 801(d)(1) advisory committee's note; *see also Vanston v. Conn. Gen. Life*

*Ins. Co.*, 482 F.2d 337, 344 (5th Cir. 1973) (quoting committee note and recognizing this circuit as having adopted the rule).  The Government argues that the direct examination exchange between the prosecutor and Fry, quoted at the outset of this section, was sufficient to serve as an adoption.

The hearsay rule stands as a bulwark against unreliable testimony, and thus hearsay exceptions and exclusions have been carefully crafted.  As made clear in the committee note and our case law, the prior statement must be acknowledged and affirmed *on the stand* in order to be admissible for substantive purposes independent of use as a prior inconsistent statement.  As the above exchange illustrates, Fry did acknowledge that he had made the statements in the factual resume.  However, he did not admit *on the stand*, in the presence of the jury, that they were true statements, only that he had previously sworn they were true.  The prosecutor's careful use of the past tense when asking about the truth of the factual resume—"*did* you swear that everything contained in the factual resume was true and correct?"—is insufficient to establish Fry's affirmation on the stand at Demmitt's trial.  *Cf. Cisneros-Gutierrez*, 517 F.3d at 758 (holding that a witness's admission under oath at a plea hearing that a factual resume was "true and correct in every respect" demonstrated sufficient adoption such that the factual resume could be used as a prior inconsistent statement).  We thus conclude that Fry did not adopt the factual resume on the stand at Demmitt's trial.

As the factual resume was not adopted on the stand, it was hearsay and should not have been admitted.  The trial court erred when it admitted the factual resume, and its error was an abuse of discretion.  That, however, does not end our inquiry because we now must assess whether the error was harmless.

*2. Harmless Error*

Under the Federal Rules of Evidence, when "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . .

is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition," the statement is not hearsay. Fed. R. Evid. 801(d)(1).

The parties do not dispute that at the time the factual resume was entered into evidence, the document was not yet a prior inconsistent statement. We agree because, as demonstrated by the above testimony, at the time the evidence was admitted, Fry had not yet made any inconsistent statements concerning facts also contained in the factual resume.

Instead, the Government asserts that the factual resume's admission was harmless because it *later* became a prior inconsistent statement under Federal Rule of Evidence 801(d)(1)(A). Specifically, the Government contends that because Demmitt then cross-examined Fry about the factual resume, "by the time of Fry's redirect examination, the factual resume had clearly become a prior inconsistent statement admissible for its truth under [Federal Rule of Evidence] 801(d)(1)(A)." We disagree with the Government's argument, but we nonetheless find the error harmless due to the totality of the evidence adduced at trial.

We first dispense with the Government's argument that the "premature admission of evidence whose foundation is later established is harmless error." Demmitt argues, and the Government implicitly concedes, that Demmitt herself was essentially forced to elicit Fry's inconsistent testimony, thereby correcting the trial court's admission error. After the trial court erroneously admitted the factual resume, Demmitt was left with an unenviable choice: (1) decline to cross examine Fry on the factual resume's contents and hope that on appeal, Demmitt would prevail on an argument that the document was impermissible hearsay or (2) cross-examine Fry on the document in an attempt to undermine its effectiveness, thereby satisfying Federal Rule of Evidence 801 in the process. Such a prosecution tactic is impermissible, and we decline to endorse it by

9

finding that the trial court's error was ameliorated by *Demmitt*'s cross-examination.

However, even though we disagree with the Government's argument about subsequent inconsistency, that does not end our inquiry into the error's harmlessness. Instead, we must consider the admission of the factual resume "not in isolation, but in relation to the entire proceedings." *United States v. Williams*, 957 F.2d 1238, 1244 (5th Cir. 1992) (citation and internal quotation marks omitted). Our examination is "fact-specific and record-intensive, requiring a close review of the entire trial proceedings." *El-Mezain*, 664 F.3d at 526. "[W]e must judge the likely effect of any error in the case before us based on the totality of the circumstances in this trial." *Id.* "Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." *Id.* (citation and internal quotation marks omitted) (alterations omitted). "It is well established that error in admitting evidence will be found harmless when the evidence is cumulative, meaning that substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence." *Id.* (collecting citations).

After carefully reviewing the record, we conclude that the erroneous admission of the factual resume does not require reversal. Although the case against Demmitt was circumstantial, in light of the volume of evidence presented by the prosecution that supports the same facts and inferences as those in the factual resume, we conclude the admission was harmless.

The factual resume stated that Demmitt was actually involved in the fraud. Other trial testimony could lead to the same conclusion or to the conclusion that she was deliberately ignorant of it, either of which is sufficient basis for conviction. *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 (5th Cir. 2010) ("Deliberate ignorance is the legal equivalent of knowledge."). Broadly defined, there were four types of evidence presented at trial, in addition to Fry's factual resume, that lead to this conclusion.

No. 11-11120

First, there was ample testimony that Demmitt was made aware of problems with client accounts. For example, Allianz Senior Special Investigator Barbara Krueger testified that Demmitt was copied on letters Allianz sent about changes to client annuities, and Fry testified that he "probably" informed his mother that he was sending faxes to Allianz using her name. There were also several instances in which clients directly informed Demmitt that their money had not been properly deposited in their Allianz annuities. For example, client Richard Burdett informed Demmitt that Fry had personally cashed a check he had written, but the money had not been deposited in Burdett's Allianz account. Burdett testified that Demmitt denied Fry's signature was on the check and claimed that the money had been deposited in Burdett's Allianz account. Burdett testified that he did not think Demmitt believed what she told him. Another client, Dahl Clower, testified that Demmitt accepted checks made out to Fry from Clower's wife, as well as discussed the fake Allianz bonus structure with her. A third client, Georgiann McCormick, testified that Demmitt was aware other clients were complaining that their money had not been deposited in their Allianz annuities. McCormick further testified that she did not believe Fry acted alone or fooled Demmitt.

Second, there was testimony that Demmitt tightly controlled the business and that Fry frequently consulted Demmitt before he made any decisions. For example, former employee Jan Burchfield testified that only Demmitt and Fry were permitted to answer the business telephone or open the business mail. Fry also testified that Demmitt sometimes opened the mail. Additionally, Burchfield testified that she assisted Demmitt in organizing client files around August 2008, and that Demmitt and Fry shared business decisions. Another former employee, Delores Austin, testified that Demmitt was in charge of the office and that Demmitt prohibited her from standing near the copy machine when Demmitt made copies. Multiple people also testified that Fry frequently

11

consulted Demmitt before making decisions.  For example, Austin testified that Fry called his mother to find out how he should pay Austin after she refused to accept a personal check for fear it would be returned for insufficient funds. Streu testified that Demmitt became involved when Streu's husband set up a payment plan for Fry, who was delinquent in repaying the truck loan for which Streu's husband had signed.  Demmitt personally delivered Fry's payments and required the Streus to sign a receipt for each.  Later, when the Streus decided to repossess Fry's truck after Fry stopped paying on the loan, Demmitt called Streu to attempt to convince her not to repossess the truck.

Third, there was significant evidence that Demmitt's annuity commissions alone could not have supported her business or personal expenses, yet she and Fry made frequent and expensive purchases.  For example, Demmitt's bank records show that she often received only about $1 per month in commission from Allianz.  Nevertheless, both Fry and Demmitt purchased new vehicles, and Demmitt made numerous QVC purchases.  Demmitt and Fry also made down payments on two houses, and Demmitt made numerous payments to the interior decorator who was working on preparing the warehouse for Demmitt's planned call center.

Finally, there was substantial evidence that Demmitt participated in or that her bank accounts received suspicious financial transactions.  Demmitt and Fry had at least one joint account into which client-signed checks were directly deposited.  On other occasions, Fry cashed client checks and Demmitt deposited the cash into her accounts in suspicious quantities.  For example, at least one of these transactions involved a deposit of one hundred and twenty $100 bills.

We hold that the record shows the Government presented significant evidence, albeit circumstantial, that demonstrated Demmitt was actually involved in Fry's scheme or deliberately indifferent to it.  Given that this

No. 11-11120

evidence is cumulative of the factual resume, we hold that the trial court's error in admitting the factual resume was harmless and does not warrant reversal.

### III. DELIBERATE IGNORANCE INSTRUCTION

Over Demmitt's objection, the trial court gave the jury a deliberate ignorance instruction. The trial court did, however, agree to include a limiting instruction, which was included as the last sentence in the deliberate ignorance instruction:

> You may find that a defendant had knowledge of a fact if you find that the Defendant deliberately closed her eyes to what otherwise would have been obvious to her. While knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless, or foolish, knowledge can be inferred if the Defendant deliberately blinded herself to the existence of a fact. This does not lessen the Government's burden to prove, beyond a reasonable doubt, that the knowledge elements of the crimes have been satisfied.

On appeal, Demmitt challenges the propriety of the trial court's deliberate ignorance instruction.

### A.    Standard of Review

We utilize an abuse of discretion standard when reviewing a district court's jury instructions. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 504-05 (5th Cir. 2012) (citation omitted). We use a two-part test to review challenges to particular instructions. *Id.* at 505 (citation omitted). First, the appellant "must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Id.* (citation and internal quotation marks omitted). Second, even if a jury instruction were given in error, we will not reverse the district court if, "in light of the entire record, the challenged instruction could not have

13

affected the outcome of the case." *Id.* (citation and internal quotation marks omitted).

When a defendant contends that a jury instruction was inappropriate, we consider whether the charge was both legally accurate and supported by fact. *See United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003) (citations and internal quotation marks omitted). "In assessing whether the evidence sufficiently supports the district court's charge, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *Id.* (citations and internal quotation marks omitted). If we determine the charge was erroneous, we review for harmless error. *Id.* (citations and internal quotation marks omitted).

**B.    Discussion**

We first note that Demmitt has not challenged the district court's instruction as an incorrect statement of law. Therefore, our sole ground for review is whether the instruction was supported by fact. We conclude that it was.

Due to concerns that a jury will convict a defendant for what she *should* have known rather than the appropriate legal standard, we have "often cautioned against the use of the deliberate ignorance instruction." *Mendoza-Medina*, 346 F.3d at 132 (citations omitted). It is improper for a district court to instruct a jury on deliberate ignorance "when the evidence raises only the inferences that the defendant had actual knowledge or no knowledge at all of the facts in question." *Id.* at 134 (citation omitted).

We use a two-prong test to determine whether the evidence supports a deliberate ignorance instruction, wherein the evidence presented at trial "must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct and (2) the defendant

purposefully contrived to avoid learning of the illegal conduct." *Id.* at 132-33 (citation omitted).

In evaluating the first prong, we have noted that "the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *United States v. Conner*, 537 F.3d 480, 487 (5th Cir. 2008) (citation and internal quotation marks omitted).

In discussing the second prong, we have cautioned that

> the *sine qua non* of deliberate ignorance is the *conscious* action of the defendant—the defendant *consciously* attempted to escape confirmation of the conditions or events he strongly suspected to exist. Where the choice is simply between a version of the facts in which the defendant had actual knowledge, and one in which he was no more than negligent or stupid, the deliberate ignorance instruction is inappropriate.

*Mendoza-Medina*, 346 F.3d at 133 (citations and internal quotation marks omitted). We have held that the second prong can be established where "the circumstances in the case were so overwhelmingly suspicious that the defendant's failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge." *Conner*, 537 F.3d at 486 (citation and internal quotation marks omitted) (alterations omitted).

"Under well-established precedent, the error in giving a deliberate ignorance instruction in the absence of evidence of contrivance is harmless where there is substantial evidence of actual knowledge." *United States v. Delgado*, 672 F.3d 320, 341 (5th Cir. 2012) (en banc) (citation and internal quotation marks omitted).

   *1. Prong One*

We hold that the trial testimony raises a strong inference that Demmitt was subjectively aware of the existence of Fry's illegal conduct.  Much of the evidence supporting this inference is presented in Sub-section II.B, *supra*.  Therefore, we need not reiterate all of the relevant facts, but we highlight a few of the more telling pieces of evidence.  First, at least two clients informed Demmitt that they were missing money from their Allianz annuity accounts.  Second, Allianz copied Demmitt on letters it sent to clients, confirming changes to their annuity accounts.  Finally and most tellingly, Fry deposited client checks directly into bank accounts he jointly owned with Demmitt.  Thus, there was ample evidence to support an inference that Demmitt was subjectively aware of Fry's illegal conduct, and the first prong is satisfied.

*2. Prong Two*

Demmitt contends there is no evidence to show she contrived to avoid learning of the illegal conduct.  We disagree.  Instead, there is ample evidence that the circumstances were "so overwhelmingly suspicious" that Demmitt's "failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge."  *See Conner*, 537 F.3d at 486.  Much of this evidence overlaps with that discussed in Prong One.

Perhaps most tellingly, Demmitt frequently deposited large sums of cash that she likely obtained from Fry, often in relatively small bills, into her bank accounts.  Second, even though the Allianz commissions were clearly unable to support business and personal accounts, Fry and Demmitt made numerous purchases, totaling thousands of dollars per month.  In addition, even after Detective Vargas notified Demmitt that Fry was being investigated for fraud, Fry deposited a $60,000 client check into his and Demmitt's joint bank account.  Finally, as discussed above, several clients notified Demmitt that their money had not been deposited into their Allianz annuity accounts.  Given all these

suspicious facts, Demmitt's failure to conduct further inspection or inquiry suggests a conscious effort to avoid incriminating knowledge.

Moreover, Demmitt admits on appeal that she "devoted all of her attention to the creation of a call center," and this evidence also was presented to the jury. As the government argues, the jury could have inferred that by doing so, Demmitt purposefully contrived to avoid learning of Fry's illegal conduct associated with the annuity business. Thus, the second prong is satisfied.

Because the evidence adduced at trial satisfies both prongs, we conclude that the district court's deliberate ignorance instruction was proper.[1]

## IV. MONEY LAUNDERING CONVICTION

Demmitt challenges her conviction under 28 U.S.C. § 1956(a)(1)(B)(i), which was identified in the indictment as Count 27. She first argues that the difference between the date of the action charged in the indictment and the date about which evidence was presented at trial is a fatal variance from the indictment. She next argues that there was insufficient evidence to satisfy the elements of the statute. Because we agree that the Government did not present sufficient evidence to support Demmitt's conviction under the statute, we need not reach her fatal variance argument.

## A. Standard of Review

We review de novo whether sufficient evidence was presented at trial to support a conviction. *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999) (citation omitted). Our review is highly deferential to the verdict. *United States v. Elashyi*, 554 F.3d 480, 491 (5th Cir. 2008) (citation and internal quotation

---

[1] Even if both prongs of the test were not satisfied and the district court erred in giving the deliberate ignorance instruction, we hold the error harmless because there was substantial evidence that Demmitt was aware of the scheme. *See, e.g., United States v. Peterson*, 244 F.3d 385, 395 (5th Cir. 2001) (permitting deliberate ignorance instruction where evidence showed defendants were deliberately indifferent or had actual knowledge that they were engaged in fraud).

marks omitted). We review "whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Ned*, 637 F.3d 562, 568 (5th Cir. 2011) (per curiam) (citation omitted). We consider the evidence in the light most favorable to the Government, and we draw all reasonable inferences and credibility choices in support of the verdict. *Id.* (citation omitted). We assess whether "the trier of fact made a rational decision, rather than whether it correctly determined the defendant's guilt or innocence." *Id.* (citation omitted). The standard of review does not change, even though the evidence in this case was largely circumstantial. *See id.* (citation omitted).

## B. Discussion

The statute under which Demmitt was charged in Count 27 is as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced . . . .

18 U.S.C. § 1956(a)(1)(B)(i). The indictment charged Demmitt with violating the statute when she transferred $3,000 via wire to her son, Tad. Demmitt argues that the Government did not prove that the wire transfer was "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the fraudulently obtained money. Despite our demanding standard of review, we agree.

The Supreme Court has interpreted the statute's element requiring a design to mean "purpose or plan; *i.e.*, the intended aim of the [transaction]." *Cuellar v. United States*, 553 U.S. 550, 563 (2008) (interpreting 18 U.S.C.

No. 11-11120

§ 1956(a)(2)(B)(i), which prohibits transporting, transmitting, and transferring money when it is designed to conceal or disguise the proceeds in specified ways). We have previously applied *Cuellar*'s statutory interpretation to 18 U.S.C. § 1956(a)(1)(B)(i). *See United States v. Brown*, 553 F.3d 768, 786 n.56 (5th Cir. 2008).

> We have explained *Cuellar* as follows:
>
>> In *Cuellar*, the Supreme Court overturned an en banc decision of this court. The Court first held that the "designed to conceal" element of this statute does not require the government to prove that a defendant sought to "create the appearance of legitimate wealth," because in this provision of the statute, "Congress used broad language that captures more than classic money laundering." However, the Court limited the statute's breadth somewhat: "[M]erely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money."

*Brown*, 553 F.3d at 786-87 (quoting *Cuellar*, 553 U.S. at 558-59, 563). The concealment of the unlawfully obtained money must be a purpose—not just an effect—of the money transfers. *Chaney*, 595 F.3d at 240-42. The way in which a transaction is structured may be related to the transaction's purpose, but "*how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Cuellar*, 553 U.S. at 566. Thus, the statute's design requirement "distinguishes the crime of money laundering from the innocent act of mere money spending." *United States v. Burns*, 162 F.3d 840, 848 (5th Cir. 1998) (citing *United States v. Willey*, 57 F.3d 1374, 1384 (5th Cir. 1995)). In *Brown*, we held the government's evidence was sufficient to satisfy *Cuellar*'s standard where "defendants intended to and did make it more difficult for the government to trace and demonstrate the nature of these funds," including by employing "classic" money laundering

19

techniques, such as conducting transactions in cash and making deposits below $10,000 to avoid reporting requirements. 553 F.3d at 787.

The evidence presented at trial shows that on August 11, 2008, Fry deposited a cashier's check from Georgiann McCormick into the bank account he jointly owned with Demmitt at Amarillo Community Federal Credit Union. This check had been obtained fraudulently. At the time of the deposit, the account balance was only $175.67. On August 21, 2008, Demmitt sent $3,000 from her account, using this money, via wire to Tad. The wire transfer receipt contains Demmitt's name, address, and account number, as well as Tad's business name. Most importantly, Tad testified that Demmitt sent the money upon Tad's request to help him purchase necessary business equipment. The Government has not suggested that Tad was part of Fry and Demmitt's scheme nor has it suggested that Tad did not need the money for business expenses.

As we noted above, mere spending of fraudulently obtained funds does not by itself satisfy 18 U.S.C. § 1956(a)(1)(B)(i). At trial, the Government proved only that the wire transfer occurred and that it was connected to fraudulently obtained money, not that Demmitt's actions were designed to conceal the fraudulent aspects of the money. Critically, the Government presented no evidence to rebut Tad's testimony that the purpose of the wire transfer was to provide money for his business expenses. Moreover, the series of transactions that culminated in the wire transfer differs from our precedent where we have upheld convictions that employed classic money laundering techniques. *See, e.g., Brown*, 553 F.3d at 787; *United States v. Powers*, 168 F.3d 741, 748 (5th Cir. 1999) (finding important that checks did not reveal on their faces that the defendant or his wife were involved in the transactions).

No such techniques appear to have been used here nor did Demmitt intend to or succeed in making "it more difficult for the government to trace and demonstrate the nature of these funds." *Brown*, 553 F.3d at 787. This is not a

No. 11-11120

case where, for this particular transaction, Demmitt commingled fraudulently obtained funds with legitimate business funds—Demmitt's legitimate business funds were so minuscule that the provenance of the client funds were not concealed when deposited into her account. Instead, Demmitt treated the fraudulently obtained money as her personal spending money, and she sent it to Tad upon his request for help with his business expenses. The Government presented no additional evidence or witnesses to explain how this transaction was designed to conceal the fraudulently obtained money in any of the specified ways.[2]

In sum, this transaction does not demonstrate any indicia of the type of unusualness or concealment that we have previously held to be sufficient to support a money laundering conviction. *See, e.g., Willey*, 57 F.3d at 1385-87 (describing unusual brokerage account transactions, the use of third parties, and "convoluted financial maneuvers" designed to conceal the source of funds).

Accordingly, in light of the evidence in the record, we hold that no rational trier of fact could have found that the evidence established all of the essential elements in 18 U.S.C. § 1956(a)(1)(B)(i) beyond a reasonable doubt. We therefore vacate Demmitt's conviction as to Count 27.

## V. CONCLUSION

In light of the foregoing, we AFFIRM Demmitt's conviction except as to Count 27. We VACATE Demmitt's conviction as to Count 27, and REMAND to the district court for proceedings not inconsistent with this opinion.

---

[2] One of the Government's witnesses testified that Georgiann McCormick's personal check was negotiated in Nazareth. Even if that is the case, the cashier's check Fry obtained is stamped as deposited into Amarillo Community Federal Credit Union on August 11, 2008, and the check is clearly labeled "Remitter: Georgiann McCormick." This check does not present the case, as demonstrated by some of the other checks, where Fry apparently deposited fraudulently obtained funds into one of his accounts, and then purchased a cashier's check in his own name, which he then deposited into another one of his accounts.