# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-20485

United States Court of Appeals
Fifth Circuit

**FILED**

November 19, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JOHN E. CARTER,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:13-CR-490

Before DENNIS and COSTA, Circuit Judges, and ENGELHARDT,* District Judge.

PER CURIAM:**

This is a direct appeal from a judgment entered in a criminal case after a jury convicted John Carter on five counts of willfully aiding and assisting in the preparation of fraudulent tax returns in violation of 26 U.S.C. § 7206(2). Carter ran a tax preparation business and helped various clients receive

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20485

sizeable tax refunds by claiming tax deductions for the charitable donation of African art even though the clients neither possessed nor donated the art during the year for which the deduction was claimed. The indictment alleged that Carter directed a co-conspirator, Sulayman Jarra, who was a Houston-based art appraiser, to "backdate" the necessary tax forms to reflect that the art donations had been made in the year of the relevant returns despite knowing that the donations had not occurred in that year. The indictment further alleged that the returns prepared by Carter claimed a charitable contribution for the appraised, fair market value of the African art despite Carter's knowledge that none of his clients had held the art for the requisite one-year holding period, as required by federal tax law, to claim the fair market value as a charitable contribution. Following a two-day trial, the jury acquitted Carter of conspiracy to aid in the preparation of false tax returns but convicted him on the five substantive counts of willfully aiding and assisting in the preparation of false tax returns.

The sole issue on appeal is whether the district court committed reversible error by refusing to instruct the jury, in accordance with *Cheek v. United States*, 498 U.S. 192 (1990), that Carter's good faith belief as to the legality of his acts did not have to be objectively reasonable in order to be considered by the jury. The Government concedes that the district court erred in refusing to provide a *Cheek* instruction with respect to one of its prosecution theories but contends that the error was harmless. Based on our careful review of the record, we agree with the Government and conclude that, in light of the entire record, the refusal to provide Carter's requested instruction could not have affected the outcome of the case. We therefore affirm his conviction.

## I.

A grand jury returned an indictment that charged John E. Carter, who made his living preparing income tax returns, with one count of conspiring to

aid in the preparation of false tax returns and five counts of aiding in the preparation of false tax returns.  The indictment alleged the following: Carter was the sole shareholder of Midwestern Financial Group, Inc. ("MFG"), a tax-preparation business.  Carter was the only person at MFG who prepared income tax returns for taxpayers.  Carter advised his clients that they could minimize tax liability by claiming tax deductions for the previous calendar year for donations of art to charitable institutions even though the clients neither possessed nor donated the art during the year for which the deduction was claimed.  These claimed donations resulted in refunds for the year in which the donation was first claimed as well as subsequent years.  The refunds that occurred in years subsequent to the donation were the result of a "carryforward," *i.e.*, the portion of a charitable contribution that a taxpayer can "carry forward" to a future year or years if the taxpayer was unable because of the amount of his or her adjusted gross income to take a deduction for the full amount of the charitable contribution in the first year that he or she claimed it.

The indictment further alleged that Carter directed a co-conspirator to appraise the donated art and produce both an art appraisal that was backdated to the year for which the client would claim the deduction and a backdated IRS form 8283, which is the requisite tax form for non-cash charitable donations, and that a representative of the donee charity also signed the form 8283, falsely acknowledging that the art had been received  by the donee in the prior year.  According to the indictment, the income tax returns that Carter ultimately prepared for his clients reflected that the art was worth more than the clients had paid or were going to pay Carter for the art.  Moreover, the indictment alleged that the tax returns "claimed a charitable contribution for the appraised, alleged fair market value of the art" despite Carter's knowledge "that none of the taxpayer clients had held the art for the holding period

3

required before being able to claim the alleged fair market value of the art as a charitable contribution." Carter allegedly attached the false appraisals and forms to his clients' tax returns and submitted all of these items to the IRS in both the initial year that the deduction was claimed and the years in which the carryforward deductions were claimed. Specifically, the indictment alleged that Carter submitted four false 2007 returns for four different clients, and one false 2008 return for one of these four clients. The clients were Robert Estill, Chandra Pierson, Duane Hightower, and Walter Patterson. According to the indictment, Carter explained to his clients that they could either give him a set fee for procuring the art for them or they could give him a percentage of their income tax refunds for all of the years in which the donation reduced their tax liability.

At trial, the jury heard testimony from IRS employees, Carter's clients, the art appraiser, Carter's daughter and Carter himself.

First, IRS employee Roman Hernandez testified regarding the specific details of the five tax returns filed by Carter at issue in this case, as well as the necessary components of completing such tax returns that claim a deduction for non-cash charitable contributions, such as art. A form 8283 is required for any non-cash charitable contribution in excess of $500. Both the appraiser and the donee are required to sign the form 8283. A signed appraisal form is also required for any donation of art in excess of $20,000. Hernandez further testified that Carter was the preparer for all five of the tax returns at issue in this case but that Carter had failed to sign the returns under penalty of perjury. All five of the returns reported large art donations, and tax refunds were issued for all five returns. Each of the returns contained a form 8283, all of which were dated December 11, 2007. This date purports to reflect both the

date that the art appraisal occurred and the date that the art actually was donated.

Next to testify were Carter's various clients whose returns were the subject of Carter's prosecution.  Robert Estill testified that he was first introduced to Carter in 2006 or 2007 and that he first met with Carter about preparing his 2007 tax return at some point in early 2008.  Estill explained that his 2007 income was "pretty high" and that he needed "additional charitable contributions" for that tax year.  According to Estill, Carter advised him at some point in 2008 that he "could buy [] art for a certain amount and then the art would actually be appraised and there w[ould] be some kind of leverage value that [Estill] could get as a deduction" on his taxes.  Carter assured Estill this was legitimate and that he had done it numerous times before.  On March 3, 2008, Estill gave Carter a check in the amount of $54,000 for the purchase of the art donated and claimed as a deduction on his 2007 tax return.  Later, on September 3, 2008, Estill gave Carter another check in the amount of $35,000 for the tax services performed by Carter.  Although Estill's tax returns represented that he owned and donated the art in 2007, he did not own the pieces of art in 2007.  Rather, he first purchased the art in 2008 by giving Carter the check in the amount of $54,000 in March 2008.  He also testified that he had never held in his hand the pieces of art claimed to be donated in 2007.  According to Estill, Carter never explained to him how he could claim a deduction for a charitable contribution in 2007 for art that he did not own until 2008.  Estill testified he did not understand what he was doing to be criminal.  Ultimately, Estill was audited by the IRS and he was forced to pay back over $700,000.

Carter's client Chandra Pierson testified next.  Pierson is a commercial banker and first met Carter in the 1990s through Carter's daughter, with whom Pierson had attended college.  The first tax return that Carter prepared

for Pierson was her 2007 return.  She testified that she had gone to Carter to discuss the return either at the end of 2007 or early 2008.  According to Pierson, she did not have any conversations with Carter or his daughter about making donations of art in connection with her 2007 tax return.  Yet, her tax return showed a donation of African art in 2007 worth $275,000 to a library in South Carolina.  She further testified that she had never donated any art to a library in South Carolina despite the fact that her 2007 tax return claimed a charitable donation of art there.  Shown a list of pieces of art claimed as charitable donations on her 2007 tax return, Pierson stated that she did not own any pieces of art in 2007, and she never understood that she had purchased any art.  She further testified that she did not know the name of the appraiser, Sulayman Jarra, whose name appeared on the corresponding appraisal tax forms that Carter filed along with her return.  Carter also prepared Pierson's tax returns for 2008 through 2011.  These tax returns included a "carryover" deduction for the 2007 art donation.  Pierson testified that she paid Carter for his tax services for these years, but she never made any payments to him for the purchase of any art.  Pierson received a tax refund for all of the years that a donation was claimed on her tax forms.

Carter's client Duane Hightower next testified.  According to Hightower, he first met Carter sometime around March 2008, at which point they discussed Carter preparing Hightower's 2007 tax return.  During their discussions about preparing Hightower's taxes, Carter inquired whether Hightower would be willing to invest money to purchase art that Carter would donate on his behalf.  Carter proposed two alternative payment options: Hightower could either (1) give Carter $21,000 upfront to pay for the art which Carter would donate over a five-year period, or (2) agree to give Carter 40 percent of any tax refund he received while Hightower would retain the remaining 60 percent.  At the time, Hightower did not ask whether Carter's

proposal was legitimate. Hightower ultimately consented to the 60/40 option. Accordingly, Hightower's tax return for 2007 claimed a deduction for the charitable donation of African art in 2007, and he ultimately received a tax refund of $13,003. Hightower testified that he never owned any of these pieces of art in 2007. He further testified that he did not know and had never met with the art appraiser, Sulayman Jarra. In 2008, Hightower paid Carter 40% of his $13,003 tax refund amount and thereafter paid Carter 40% of his tax refunds for the years 2008 and 2009. He never made any payments to Carter in 2007.

The last of Carter's former clients to testify was Walter Patterson. Prior to 2007, Patterson prepared his own taxes. Patterson testified that he met Carter through Patterson's brother-in-law, who had hired Carter to do his own taxes. Patterson first hired Carter to do his taxes for 2007. He believes he initially met with Carter about preparing his 2007 return sometime in 2008, possibly in the spring. During this meeting, Carter told Patterson that he could possibly save him money by investing in and donating art. According to Patterson, Carter told him that he would have to pay approximately $5,000 upfront in order to donate the art, which would reduce Patterson's taxes. Patterson asked Carter if this strategy was legitimate, and Carter assured him that it was and that he was making these donations on behalf of "a number of different people." Patterson agreed to this proposal, and his 2007 tax return prepared by Carter claimed a donation of art during 2007 valued at $225,300. Patterson testified that he first bought this art in 2008 when he wrote Carter a check for $5,000.

The Government next called Sulayman Jarra, the individual who appraised the art claimed to be donated in 2007 by Carter's clients. Jarra testified that he had pleaded guilty to aiding in the preparation of false tax returns and was awaiting sentencing. Jarra and his brother were the owners

of an African art gallery in Houston. Jarra testified that he purchased African art through African dealers who travel through Houston. In his appraisal biography, Jarra claimed to hold a Ph.D. from Columbia University, but he testified at trial that this was not true. Jarra testified that he learned the appraisal business from Lowell Collins, who had previously done appraisal work for Carter. After Collins's death, Jarra began to conduct appraisals for Carter. Carter would bring Jarra pieces of art to appraise for Carter's clients. Carter would pay Jarra between $50 and $100 per piece. Jarra would appraise the art at its fair market value which involved researching auction catalog values. Jarra testified that he would complete the appraisal forms and forms 8283 and then return them to Carter for filing with his clients' returns. Jarra would also obtain the requisite signatures from the donees.

With respect to the tax returns at issue in this case, Jarra testified that he completed the necessary appraisal forms and forms 8283. According to Jarra, Carter explicitly requested that he backdate the forms to reflect that the art donations had actually occurred in 2007. Jarra complied by backdating all the forms to December 11, 2007. Jarra testified that the forms were actually completed in 2008. According to Jarra, Carter knew that the forms were backdated.

The Government's final witness was Michael Greer, the IRS special agent that helped conduct the criminal investigation into the art donations claimed by Carter's clients. Greer questioned Carter on at least two occasions in connection with the investigation. According to Greer, Carter told him that he was the sole individual who prepared tax returns for MFG. Carter further told Greer that Jarra was responsible for preparing the forms 8283 and ensuring that the art was delivered to the donee. Carter told Greer that all of his clients would come to him asking about making art donations and that he never initiated these conversations himself. During Greer's second interview

with Carter, Carter told him that he had "lost his sanity" following their initial meeting and "started shredding copies of the forms 8283 that he still had in his possession."

Greer also provided testimony regarding the requirements for claiming a charitable contribution under federal tax law. Greer explained that the form 8283 and an IRS publication called Publication 526 provide instructions for claiming a charitable contribution consistent with federal tax law. Both documents are available online. Greer explained that both Publication 526 and the instructions for the form 8283 provide that a donor of art must have held the art for at least one year in order to deduct the fair market value of the art. Greer testified that the instructions to form 8283 "make clear" this requirement.

Carter's daughter, Krista Carter, testified that she had spoken with Chandra Pierson in 2006 or 2007 about Pierson's taxes. Krista told Pierson she had claimed a deduction for the charitable contribution of African art in her tax filings. She told Pierson that she might be able to do the same thing. According to Krista, Pierson seemed interested in the prospect of taking a similar deduction on her taxes. Krista testified that she had this conversation with Pierson sometime in "the beginning" of 2007.

Carter himself was the last to testify. Carter received an accounting degree in 1973 from the University of Houston. In college, he took two classes in federal tax preparation. Following graduation, Carter began working at Tenneco, where he worked in accounting. Amongst his duties were authorizing expenditures and overseeing payroll. He did not specialize in tax at Tenneco, explaining that the company had its own tax department. He worked at Tenneco for 16 years until he left in December 1988.

Carter testified that he began preparing taxes around 1996 or 1997. According to Carter, he "[b]ought some software and just started doing taxes."

No. 14-20485

He explained that he purchased TurboTax but did not take any tax courses. Carter did not advertise his tax preparation business but instead obtained clients via referrals.

Carter first learned about making deductions for charitable contributions of art through his brother, Robert, around the year 2000. At this time, Carter was preparing Robert's tax returns for him and Robert brought him a portfolio of African art that he had donated. Carter testified that other clients eventually began to come to him to ask him for help making donations of art for tax deduction purposes. According to Carter, these clients already knew about the ability to claim deductions for the donation of art. Carter testified that he began to purchase art on behalf of his clients from "people from Africa that are just in the shadows." Carter explained that these people "come over, sell their art and go back." These people only accepted cash. After purchasing the art, Carter would take the art to Jarra in order to be appraised. Carter testified that he did not know what the art was worth when he purchased it. According to Carter, Jarra had "total control of the art" once he delivered it to him. Jarra would appraise the art, have it delivered to the donee, and prepare the form 8283. Carter did not keep any inventory of the art he purchased for his clients or how much he had paid for each piece.

Carter then testified regarding his communications with the clients whose returns were the subject of his prosecution. Carter testified that he met Estill around 2007 through his brother, Robert. According to Carter, Estill "wanted to get the same kind of charitable deduction that Robert was taking each year of African art." Carter testified that Estill already knew about the African art donation deduction prior to meeting with him. Estill and Carter met and discussed Carter's "two-part" strategy. The first step was incorporation of Estill's business, which Carter did for Estill in October 2007. The second step was having Estill "buy some [art] and get it appraised and

10

donate it." Estill told Carter that "he wanted three $500,000 deductions and to buy whatever art it was to get that amount." Carter testified that he "already had" most of the art necessary for Estill's donation, but "had to buy a few pieces, because it was such a large donation." According to Carter, he used money that he had taken out on a home equity loan in order to buy Estill's art. Carter explained that "because [Estill] was a friend of my brother's and he authorized the purchase, I went ahead and took him at his word and paid for the art." However, Carter did not have a written contract with Estill since he works "on the honor system." Carter testified that he was not worried about Estill failing to pay because he was a friend of Carter's brother and "if he didn't pay, I would expect my brother Robert to pay." Carter testified that Estill gave him a $54,000 check for the art in 2008. Although Carter initially testified that he spent "maybe a hundred thousand dollars" on Estill's art, he later testified that he could not provide a specific amount. He testified that it was not less than the $54,000 that Estill paid. However, he did not know if it was more than that amount. He did not keep any records of the purchase. On the 2007 return, the art was valued at approximately $500,000.

Carter testified that he met Pierson when she attended college with his daughter, Krista. In 2007, he received a call from Pierson requesting that Carter prepare her taxes. Pierson told him that she wanted "to get an art donation just like Krista had." According to Carter, Pierson "had credit" with him since she was Krista's friend, so Carter purchased the art himself and then took it to Jarra to get the process started. Pierson agreed to pay Carter 40% of her return in exchange for the purchase of the art claimed to be donated. Carter did not keep a record of how much he paid for the art and he could not recall how much he had invested.

Carter testified that he met Hightower through another client, Art Walters, sometime around May 2007. Carter entered into a 60/40 deal with

Hightower and therefore was not paid by Hightower until after he filed his 2007 return. Carter did not enter into a written agreement with Hightower regarding the art purchase and donation. Their agreement was on a "trust basis." According to Carter, if Hightower had not paid, then he would "have expected Art Walters to have paid" him.

Carter testified that he also initially met Patterson through Art Walters, who was Patterson's brother-in-law. Patterson first visited with Carter in 2005 or 2006. According to Carter, Patterson "knew all of the tax strategies that Art Walters was doing" and eventually, in 2007, authorized Carter to facilitate an art donation on his behalf for tax purposes. This authorization followed a "year or two" of Patterson being "on the fence." Patterson told Carter that "he didn't have any funds." However, Carter told Patterson that he would "get it done" for him because he was Walter's brother-in-law. Carter testified that Patterson "was going to pay [him] some money when he got it." Carter purchased the art for Patterson, and Patterson wrote Carter a check for $5,000 in 2008.

Carter testified that he was not aware that a taxpayer had to hold art for a year prior to donating it in order to claim a deduction for the fair market value of the art. He stated that he first became aware of this rule when he was interviewed by Agent Greer. He testified that he had never seen Publication 526, *i.e.,* the pamphlet discussed by Agent Greer that specified this rule. He further explained that he had never checked the instructions for the form 8283 or any other IRS publication concerning this issue. However, he testified that he was aware of the rule permitting a taxpayer to "carryover" any unused portion of a charitable contribution into subsequent years. He also testified that he was aware of the one-year holding rule for capital gains. Carter also

claimed that he was unaware that Jarra was "backdating" the forms 8283 for the returns at issue in this case.

In his proposed jury instructions, Carter had requested that the jury receive the following instruction:

> The government must prove beyond a reasonable doubt that the Defendant acted willfully. A defendant does not act willfully if he believes in good faith that his actions comply with the law. Therefore, if the Defendant believed that what he was doing was in accord with the tax statutes, he cannot be said to have acted with criminal intent. Therefore, if you find that the Defendant honestly believed that he was not violating the tax laws, even if that belief was unreasonable or irrational, then you should find him not guilty. However, you may consider whether the Defendant's belief was actually reasonable as a factor in deciding whether he held that good faith belief.
>
> The burden of establishing lack of good faith and criminal intent rests upon the prosecution. A defendant is under no burden to prove his good faith; rather, the prosecution must prove bad faith beyond a reasonable doubt.

The Government objected to the instruction on the grounds that the second paragraph was an incorrect statement of law. During a pretrial conference, defense counsel admitted that the Government's objection was meritorious but maintained that the remainder of the instruction was correct.

During trial, before the jury was instructed, defense counsel again argued that the willfulness instruction should inform the jury "that a good faith belief may be objectively unreasonable if sincerely held." Counsel averred that, under *Cheek*, "if the defendant ultimately believed that he was not violating any tax laws, even if that belief is unreasonable or irrational, then you should find him not guilty." The district court disagreed with the defense's interpretation of *Cheek* and therefore refused to provide the requested instruction. The jury was instead instructed that:

Carter's acts in connection with income tax returns are not willful if they are done through inadvertence, carelessness, justified excuse, or honest misunderstanding of the law.

The defendant is not guilty of willfully preparing a false or fraudulent return if he in good faith believes that the return, as he prepared it, truthfully reports the client's income-tax information. Even if the income was understated or the deductions or credits were overstated, he is not guilty unless he knew the return to be false and authorized its filing with the intent to violate the law.

The jury acquitted Carter of the conspiracy count but convicted him of five counts of willfully aiding the preparation of false tax returns. The district court imposed a within-guidelines sentence of 41 months in prison and a one-year term of supervised release. Carter timely noticed his appeal.

## II.

Carter's sole argument on appeal is that the district court committed reversible error by failing to include in its willfulness instruction to the jury "that a good faith belief may be objectively unreasonable if sincerely held." In view of the Government's concession that the district court committed error, we simply review for harmless error. Thus, the salient question before us is whether, "in light of the entire record, the challenged instruction could not have affected the outcome of the case." *United States v. Demmitt*, 706 F.3d 665, 675 (5th Cir. 2013) (internal quotation marks omitted); *see also United States v. Nguyen*, 493 F.3d 613, 623 (5th Cir. 2007) (same).

Applying that standard to the instant record, we conclude that the district court's error was harmless and therefore not reversible because the evidence at trial showing Carter willfully aided in the preparation of false tax returns "was so overwhelming that the error could not have contributed to the jury's decision to convict." *United States v. Montgomery*, 747 F.3d 303, 310 (5th Cir. 2014) (internal quotation marks and citation omitted). In particular, the evidence in support of the Government's "backdating" theory of prosecution is

No. 14-20485

"overwhelming" and evinces that the district court's refusal to provide Carter's requested instruction did not affect the jury's verdict. *Id.* As detailed above, the Government presented substantial evidence at trial showing that Carter knew that the tax returns were fraudulent because the art claimed to be donated in 2007 was actually donated in 2008. IRS agent Michael Greer testified that a deduction for an art donation may be claimed only in the year in which art is actually donated. Unlike the one-year holding rule for claiming a deduction of donated art's fair market value, Carter never testified or otherwise argued in his defense that he was unaware of the rule requiring that the deduction be claimed in the same year as the donation. Each of the tax returns prepared and filed by Carter included forms 8283 that were dated December 11, 2007. This date purports to reflect both the date that the art appraisal occurred *and* the date that the art was actually donated by Carter's clients. However, as detailed below, all four of Carter's clients consistently testified that they never owned any of the art in 2007.

Estill testified that he did not discuss with Carter the possibility of donating art for tax purposes until 2008. Estill further testified that he never purchased any art until 2008 when he gave Carter the check in the amount of $54,000 in March 2008. Nevertheless, Estill's 2007 and 2008 tax returns prepared and filed by Carter both contain forms 8283 that represent that Estill donated art in 2007. Similarly, although Pierson could not definitively recall whether she first discussed her taxes with Carter in 2007 or 2008, she testified unequivocally that she did not own or donate any pieces of art in 2007, and she never understood that she had purchased any art. Nevertheless, her tax return prepared and filed by Carter showed a donation of African art in 2007 worth $275,000 to a library in South Carolina. Likewise, Hightower testified that he first met Carter sometime around March 2008 and it was only then that they discussed Carter preparing Hightower's 2007 tax return and the

possibility of making a charitable contribution of art for the 2007 return. Accordingly, Hightower never made any payments to Carter for the purchase of art in 2007, and he testified that he never owned any of these pieces of art in 2007. Nevertheless, Hightower's tax returns prepared by Carter represented that he had donated art on December 11, 2007. Finally, Patterson also testified that he did not meet with Carter about his 2007 return until 2008 and that it was only at this point in time that Carter discussed with him the possibility of donating art for tax purposes. Yet, Patterson's return also claimed that he had donated art in 2007. Patterson never paid Carter for the art claimed to be donated in 2007.

Consistent with Carter's clients' testimony, Jarra testified that he did not receive the art from Carter to appraise until 2008, and that Jarra did not deliver the art to the donees or obtain the donees' signatures until 2008. Jarra further testified that Carter specifically had instructed him to backdate the forms 8283 to 2007 and Carter was therefore aware that the forms were backdated by Jarra.

There was also other evidence reflecting Carter's awareness that the tax returns he prepared were fraudulent. For example, Agent Greer testified—and Carter admitted—that Carter destroyed copies of various forms 8283 in his possession after Greer's first interview of him. Further, Carter refused to sign the relevant tax returns under penalty of perjury, as is required of tax preparers.

Carter argues that the jury's acquittal of him on the conspiracy count "speaks strongly to the weight that can be given to the backdating scheme in a harm analysis." According to Carter, the Government's "backdating" theory of prosecution "overtly relies on an agreement between Mr. Jarra and Mr. Carter to effectuate the backdating scheme." We disagree. The thrust of Carter's argument is that the jury's acquittal on the conspiracy count represents an

implicit rejection of Jarra's trial testimony that Carter expressly instructed him to backdate the forms 8283, to which Jarra consented.  However, even if we were to disregard Jarra's testimony that Carter specifically instructed him to backdate the forms, there is nevertheless overwhelming and consistent testimony from Carter's various clients that they never purchased or donated any art in 2007 and that they never even discussed the possibility of an art donation with Carter until 2008.  In other words, even ignoring evidence indicating that Carter and Jarra entered into an express agreement to "backdate" the forms 8283, there is nevertheless overwhelming evidence showing that Carter willfully aided and assisted in the preparation of fraudulent tax returns as charged in the indictment.

For these reasons, the judgment of the district court is AFFIRMED.